IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TAICHIN PREYOR, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 5:10-CV-00857-FB |
| | § | *CAPITAL CASE* |
| RICK THALER, | § | |
| Director, Texas Department | § | |
| of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT THALER'S ANSWER WITH BRIEF IN SUPPORT

Petitioner Taichin Preyor was properly convicted and sentenced to death in Texas state court for the murder of Jami Tackett. He now challenges his conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. However, Preyor's petition should be denied because he fails to demonstrate that he is entitled to federal habeas relief.

## PREYOR'S ALLEGATIONS

Respondent Rick Thaler (the Director) understands Preyor to raise the following grounds for relief:

1. He was deprived of effective assistance of trial counsel because counsel:

   (a) failed to call Preyor to testify that he acted in self-defense;

   (b) failed to investigate and adequately prepare for defense at trial;

(c)     failed to object during voir dire to the prosecution lecturing prospective jurors, using brainwashing tactics, and indoctrinating jurors;

(d)     failed to conduct any voir dire regarding racial bias or prejudice; and

(e)     knowingly made false, inconsistent and confusing representations to the jury in opening and closing arguments.

2.      Appellate counsel was ineffective for failing to raise the above ineffective-assistance-of-trial-counsel claims on direct appeal.

3.      State habeas counsel was ineffective for:

(a)     arguing trial strategy in the state habeas application;

(b)     failing to produce any evidence at the evidentiary hearing;

(c)     failing to prepare proposed findings of fact and conclusions of law as ordered by the court; and

(d)     failing to file a motion to appoint himself or other counsel for purposes of federal habeas review.

Preyor's claims for relief fail.   Claims 1(a), 1(c), 1(d), and 2 are procedurally defaulted based on an adequate and independent state procedural rule.   Claims 3(a)-3(d) are not cognizable on federal habeas review.   And all of Preyor's allegations are without merit and must be denied.

## STATEMENT OF THE CASE

Preyor was convicted and sentenced to death for the murder of Jami Tackett while in the course of committing and attempting to commit burglary. CR 4, 204, 216-18, 222-23.[1]  The Texas Court of Criminal Appeals affirmed Preyor's conviction and sentence in an unpublished opinion on January 23, 2008. *Preyor v. State*, No. AP-75119, 2008 WL 217974 (Tex. Crim. App.).

Preyor filed a state application for writ of habeas corpus in the trial court. 1 SHCR 41.  Preyor then filed a subsequent state habeas application in the trial court about a year later.  2 SHCR 59.  The trial court eventually held a hearing at which no evidence was presented.  Instead, Preyor testified that his family had retained separate counsel for postconviction review and had filed a subsequent application. *See* Writ Hearing at 3-7.  The trial court then submitted findings of fact and conclusions of law recommending that Preyor be denied relief with respect to his original application.  1 SHCR 99-117.  The Court of Criminal Appeals adopted the trial court's findings and conclusions and denied Preyor's original application. *Ex parte Preyor*, No. 72,660-01 at cover and Order.

---

[1]  "CR" refers to the clerk's record of pleadings and documents filed with the court during trial, followed by page number(s).  "RR" refers to the state record of transcribed trial proceedings, preceded by volume number and followed by page number(s).  "SX" refers to State's Exhibit, followed by exhibit number(s).  "SHCR" refers to the state habeas record, preceded by volume number and followed by page number(s).

On that same date, the Court of Criminal Appeals dismissed Preyor's subsequent application pursuant to Texas Code of Criminal Procedure, Article 11.071, Section 5(a). *Ex parte Preyor*, No. 72,660-02 at cover and Order.

Preyor filed a federal petition in this Court on October 21, 2010. *See* Docket Entry (DE) 1. On December 11, 2010, Preyor filed an amended petition, which is essentially identical to his original complaint. DE 7. The Director's answer follows.

## STATEMENT OF FACTS

The Court of Criminal Appeals summarized the facts of the crime and those pertaining to punishment as follows:

> The evidence showed that [Preyor], also known as "Box," murdered Jami Tackett in the course of committing or attempting to commit burglary of a habitation on February 26, 2004. [Preyor] was friends with Tackett, who sold drugs and kept cocaine in a safe in her apartment. [Preyor] called Tackett earlier in the evening and said he was coming over to her apartment that night. Tackett and some friends, including Jason Garza, partied at her apartment into the early morning hours. The last guest left at about 4:00 a.m., at which point Tackett and Garza locked the front door, turned out the lights, and went to bed. Shortly thereafter, [Preyor], who was dressed from head to toe in black clothing, broke through the front door and entered Tackett's bedroom. Tackett asked, "Box, what the hell are you doing here?" [Preyor] said, "Fuck this," then jumped on the bed and began attacking Garza. [Preyor] stabbed Garza, who managed to run away and asked neighbors to call for help, leaving Tackett alone with [Preyor]. [Preyor] then stabbed Tackett numerous times and slashed her throat, severing her trachea, jugular vein, and carotid artery. [Preyor] initially tried to leave the scene in his car, which was parked downstairs, but he went back into Tackett's apartment, where he apparently searched for his car

keys while Tackett struggled to breathe on her living-room floor. He encountered the police when he went back downstairs, and he failed to comply when they ordered him to stop and get on the ground. The officers struggled to handcuff [Preyor], who was covered in blood, and used pepper spray to subdue him. Tackett died before the paramedics arrived. Police discovered a loaded shotgun on the bumper of [Preyor's] car and a knife and gloves in the grass nearby.

The State introduced evidence at the punishment phase that [Preyor] had committed a prior drug offense in Syracuse, New York, in 1999. Syracuse Police Officer Tim Laun testified that he had noticed [Preyor] and another man acting suspiciously at 2:00 a.m. He did a pat-down search of [Preyor] and discovered that he had a bag containing nearly four ounces of crack cocaine.[2] [Preyor] fled, and another officer later tackled and handcuffed him. [Preyor] pleaded guilty to possession of a controlled substance in exchange for a one-year sentence. A charge of resisting arrest was dismissed as part of his plea bargain. He told his probation officer that he had used cocaine since adolescence, and that he had started using it consistently in 1998, when he had an affair with a woman who was a drug abuser.

[Preyor] also told his probation officer that the crack cocaine was for his own personal use. However, when he was interviewed by clinical psychologist Dr. Joanne Murphy prior to his capital-murder trial, he acknowledged that he had been selling drugs.

After serving time for his drug offense, [Preyor] moved to San Antonio, where he was joined by his wife and children. About one month before the instant offense, on January 14, 2004, the police went to [Preyor's] apartment on a "family violence call." [Preyor] was angry that police were there, and he was pacing, yelling, and screaming. He calmed down when his brother, a San Antonio police officer, arrived. His wife, who was "very pregnant" with their fourth child, did not appear to be injured and stated that she did not need assistance.

---

[2]     Laun testified that this amount of crack cocaine would sell for approximately $10,000.

[Preyor] committed the following disciplinary infractions while in the Bexar County Jail awaiting trial: (1) possessing ten tablets of Tylenol, instead of the two tablets permitted; (2) disobeying an order from staff; and, (3) engaging in "loud, boisterous behavior or communication with other inmates" by lifting the lid on his cell door.  The evidence also showed that [Preyor] had the dates of his drug offense and the instant capital murder tattooed on his body.  He told Dr. Murphy that the tattoos were to remind him of mistakes that he never wanted to repeat.

*Preyor v. State*, 2008 WL 217974 at *1-*2 (footnote in original).

## STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claim by the state court, (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court; or (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quoting *(Terry) Williams v. Taylor,* 529 U.S. 362, 412 (2000)); 28 U.S.C. § 2254(d).  The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme

6

Court precedent, yet reaches an opposite result. *(Terry) Williams*, 529 U.S. at 405-06.

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407-09. And as the Supreme Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree that those arguments* or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 131 S. Ct. at 786 (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter,* 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti,* 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-

court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado,* 541 U.S. at 664. This is particularly true when reviewing a state court's application of *Strickland v. Washington,* 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d), creates a difficult to surmount, "doubly" deferential assumption in favor of the state court denial. *Richter,* 131 S. Ct. at 786.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter,* 131 S. Ct. at 786.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state criminal justice systems," *not a substitute for ordinary error correction through appeal.*

*Id.* (emphasis added) (internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning. *Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th

Cir. 2001); *see also Catalan v. Cockrell*, 315 F.3d 491, 493  (5th Cir.  2002) (". . . we review only the state court's decision, not its reasoning or written opinion . . . ."). Indeed, state courts are presumed to "know and follow the law." *Visciotti*, 537 U.S. at 24. And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Richter*, 131 S. Ct. at 786.

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard. *(Terry) Williams*, 529 U.S. at 381. Stated differently:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Richter*, 131 S. Ct. at 786-87 (emphasis added). And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand . . ." because such a

process suggests the proposed rule is not clearly established.  *Alvarado,* 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."  *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).

And except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state court fact finding must have been presented to the state court.  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254(d)(2).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual

10

development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty.  28 U.S.C. § 2254(e)(2).  A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence.  *(Michael) Williams v. Taylor,* 529 U.S. 420, 436 (2000).  For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2).  *Id.* at 433.  But even if the petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits.  *Clark v. Johnson,* 227 F.3d 273, 284-85 (5th Cir. 2000).

## ARGUMENT

### I.   The Majority of Preyor's Claims Are Procedurally Defaulted.

In the instant petition, Preyor contends that trial counsel was ineffective for (1) failing to allow Preyor to testify at trial; (2) failing to adequately investigate and prepare a defense for trial; (3) failing to object to the prosecutor's lecturing to prospective jurors, use of brainwashing tactics rather than asking

questions, and indoctrination of prospective jurors; (4) failing to conduct any voir dire regarding racial bias or prejudice; and (5) knowingly making false, inconsistent and confusing representations to the jury in opening and closing arguments.  Amended Petition at 12-22.  Preyor also claims that appellate counsel, who was his co-counsel at trial, was ineffective for failing to raise these issues on appeal.  *Id.* at 23-26.

Preyor raised these allegations in his subsequent state habeas application, which the Court of Criminal Appeals dismissed as an abuse of the writ.  2 SHCR 5-21; *Ex parte Preyor*, 72,660-02 at cover and Order.  He did, however, present an ineffective-assistance-of-trial-counsel claim in his original application, which the state court rejected on the merits.  1 SHCR 7-10.  In this claim, Preyor complained about counsel's overall trial strategy, with emphasis on counsel's opening and closing statements.  *Id.*  Because this claim is similar to claims 2 and 5 above, it is perhaps arguable that these two allegations are not procedurally barred.[3]  Nonetheless, the remainder are.

---

[3]      However, Preyor seems to suggest that the claims are not similar.  In his amended petition, Preyor alleges that his first state habeas counsel was ineffective for arguing that trial counsel was ineffective for utilizing an improper trial strategy.  Preyor states: "There are no reported United States Supreme Court cases that hold that mere 'trial strategy' is a basis for an ineffective assistance of counsel claim."  Amended Petition at 26-27.  In other words, Preyor is arguing that his first state habeas attorney made an improper allegation, whereas the proper claim was raised in his successive state application by his second state habeas attorney, who is his current counsel.  If the claims in his original and successive state applications are truly distinct, as Preyor indicates, then claims 2 and 5, which mirror those in his successive

Federal review of a habeas claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989). Further, where a state court has explicitly relied on a procedural bar, a state prisoner may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice, or that the federal court's failure to consider the claim will result in a miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Failure to raise a claim in an initial state habeas corpus application may not be excused for cause unless the claim was not "reasonably available" at the time of the prior petition. *Fearance v. Scott*, 56 F.3d 633, 636 (5th Cir. 1995). And a miscarriage of justice in this context means that the petitioner is actually innocent of the crime of which he was convicted or of his death sentence. *Sawyer v. Whitley*, 505 U.S. 333, 339-40, 349 (1992).

The Fifth Circuit has held that after the Court of Criminal Appeals' decision in *Ex parte Barber*,[4] Texas's abuse-of-the-writ doctrine is an adequate and independent state ground. Accordingly, where a state prisoner has been cited for abuse of the writ following *Barber*, federal habeas corpus review of his

---

application, are procedurally barred. *See Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (to satisfy the exhaustion requirement, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state law claim was made") (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).

[4]        879 S.W.2d 889, 892 n. 1 (Tex. Crim. App. 1994).

claims in that writ application is barred. *Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003) (recognizing that the Texas abuse-of-the-writ doctrine is firmly established and regularly followed); *Fearance,* 56 F.3d at 642. Moreover, the Fifth Circuit has recently reaffirmed that the abuse-of-the-writ doctrine operates as an adequate and independent state law ground that bars federal habeas relief. *Balentine v. Thaler*, 626 F.3d 842, 857 (*Balentine II*), *rhrg en banc denied*, 629 F.3d 470 (5th Cir. Dec. 29, 2010), *pet. for cert. filed* (Mar. 25, 2011) (No. 10-9758); *Rocha v. Thaler*, 626 F.3d 815, 837-38 (*Rocha II*), *rhrg & rhrg en banc denied*, 626 F.3d 227 (5th Cir. Dec. 17, 2010), *pet. for cert. filed* (Mar. 17, 2011) (No. 10-9659).

The above claims, therefore, are procedurally defaulted unless Preyor can demonstrate cause for the default and prejudice that is attributable to the default, or prove actual innocence. *Coleman*, 501 U.S. at 750. To show cause, Preyor has the burden of proving that "'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court. Objective factors that constitute cause include 'interference by officials' that makes compliance with the state's procedural rule impracticable, and 'a showing that the factual or legal basis for a claim was not reasonably available to counsel.'" *James v. Cain*, 50 F.3d 1327, 1331 (5th Cir. 1995) (quoting *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991)). Preyor has not even alleged any objective factor

14

that would constitute cause.  To the extent Preyor might fault state habeas counsel for not raising these allegations in Preyor's original state habeas application,[5] the Fifth Circuit has repeatedly held that ineffective assistance of habeas counsel cannot operate as cause necessary to overcome a procedural default.  *Ruiz v. Quarterman*, 460 F.3d 638, 643-44 (5th Cir. 2006); *Elizalde v. Dretke*, 362 F.3d 323, 330 (5th Cir. 2004); *Martinez v. Johnson*, 255 F.3d 229, 239-41 (5th Cir. 2001).   Additionally, Preyor does not argue, let alone demonstrate, that he is actually innocent of his conviction or sentence. Therefore, he has defaulted the above claims.

## II.   At Any Rate, Preyor's Claims Challenging Trial Counsel's Effectiveness Are Not Meritorious.

In order to establish a Sixth Amendment ineffective-assistance-of-counsel violation, Preyor must affirmatively prove that: (1) in light of all the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," *i.e.*, counsel's performance was deficient under "prevailing professional norms"; and (2) the resultant prejudice was "so serious as to deprive [him] of a fair trial, a trial

---

[5]      Preyor does raise claims pertaining to state habeas counsel's performance, Amended Petition at 26-32, but he does not specifically argue that postconviction counsel was ineffective for not presenting the above claims in the initial application. *Id.*

whose result is reliable." *Strickland*, 466 U.S. at 687-88, 690.  The failure to prove either element is fatal to the claim.  *Id.* at 697.

In applying the "deficiency" prong, judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight" and to "evaluate the conduct from counsel's perspective at the time." *Id.* at 689-90; *Wiggins v. Smith*, 539 U.S. 510, 523 (2003).  Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance," and Preyor must overcome the presumption that, under the circumstances, counsel's actions might be considered sound trial strategy. *Strickland*, 466 U.S. at 689.

Even if deficient performance can be established, Preyor must still affirmatively prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* at 687. This requires him to show a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different. *Id.* at 694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id.* The mere possibility of a different outcome is insufficient to prevail on the prejudice prong. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). As recently explained by the Court: "[T]he question in conducting *Strickland*'s prejudice analysis is *not* whether a court can be certain [that] counsel's performance had no effect on the outcome

16

or whether it is possible [that] a reasonable doubt might have been established if counsel [had] acted differently." *Richter*, 131 S. Ct. at 791 (emphasis added). Rather, the "likelihood of a different result must be substantial, not just conceivable." *Id.* at 792.

Finally, on federal habeas review, relief is not warranted even if this Court is of the opinion that Preyor has satisfied the *Strickland* standard. Instead, Preyor is entitled to relief only if this Court concludes that the state court's determination that Preyor did not satisfy *Strickland* was objectively unreasonable under 28 U.S.C. § 2254(d). *Richter*, 131 S. Ct. at 785 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard."); *(Terry) Williams*, 529 U.S. at 391; *Busby v. Dretke*, 359 F.3d 708, 717 (5th Cir. 2004).

### A. Counsel had no sound reason to call Preyor to testify on his own behalf. Moreover, the trial evidence precludes any finding of prejudice.

Preyor claims that counsel was ineffective for not calling him to testify. Amended Petition at 13-16. He claims that because self-defense was the main issue, any competent attorney would have called him to the stand, particularly

17

because there were no independent witnesses to the crime. *Id.* at 14. In addition to being procedurally barred, this allegation is meritless.

The Fifth Circuit has held that "when the record is simply that the defendant knew of his right to testify and wanted to do so but counsel was opposed, defendant acquiesced in his lawyer's advice, and therefore the only inquiry is whether that advice was sound trial strategy." *United States v. Mullins*, 315 F.3d 449, 453-54 (5th Cir. 2002). Here, there is apparently no record testimony showing that Preyor stated in open court that he discussed the matter with counsel and agreed not to testify. And because Preyor first raised this claim in his state habeas application dismissed for abuse of the writ, there is no affidavit from counsel addressing the issue. However, in the trial court's charge to the jury, the court stated: "In this case, the defendant has elected not to testify; and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations for any purpose whatsoever as a circumstance against him." 25 RR 12-13. Thus, at some point, the defense must have made the court aware that Preyor chose not to take the stand, which indicates that Preyor knew about his right. Indeed, Preyor does not claim that counsel failed to advise him of his right to testify, only that he wanted to testify that he acted in self-defense but counsel chose not to call him. Amended Petition

18

at 13-16.  Therefore, Preyor must have acquiesced to trial counsel's advice, which

was proper under the circumstances.

With respect to this claim, Preyor states:

> Petitioner's arrival time was at the direction of Tackett.
> Petitioner phoned Tackett two times.  The first time Petitioner
> called, she said she still had company and said to call back later.
> The second time Petitioner called, he called Tackett from a pay
> phone on the premises and she said to come on up.  This was
> immediately before Petitioner knocked on the door.  Petitioner
> arrived in his customary or usual, all dark clothing.  When the
> knock on the door was answered by Tackett and Garza, the two of
> them were dressed in street clothing, and appeared to be under the
> influence.  No words were exchanged by anyone.  Petitioner pulled
> out his money and money clip, which was immediately snatched
> from him, the lights were turned out, and Petitioner was attacked.

> Petitioner parked his vehicle in the property parking lot.
> However, Petitioner did not place a shotgun or rifle on the bumper
> of his vehicle.  The shotgun, or rifle, that was found by the police
> has absolutely no connection to Petitioner, and there is no credible
> evidence to the contrary.  The Petitioner would have testified to all
> of these facts.[6]

*Id.* at 15 (footnote added).  But during trial, Detective Barney Whitson read

aloud Preyor's statement to the police:

> The truth about what happened was I went over to Jami's to
> buy some drugs from her.  Jami was my connect.  I buy my drugs
> from her and I sell them to people I know.  This morning I went over
> to Jami's apartment to buy some drugs.  I had called Jami earlier

---

[6]    Preyor has not, however, provided an affidavit setting out the exact
content of his proposed testimony.

19

that day and asked her what was up.  Jami told me nothing.  Jami told me I needed to come and talk to her.  Jami told me she had company, so I told her I would hook up with her later.  It was about 11:30 p.m. on Wednesday that I talked to Jami.  When I told Jami I would hook up with her later, Jami told me to come.  Jami said she was just kicking with her home boy from the studio and everything was cool.

When Jami told me she was kicking it with someone from the studio, I thought she was hanging out with my man, Keith, because Keith is a rapper.  I was over to one of my home boy's house when I talked to Jami.  I left his crib and went to a pay phone to call Jami.  I called Jami from the pay phone.  After I finished talking to Jami, I went back to my boy's crib.  I don't want to give my boy's name, because I don't want him involved in this.  I stayed over at my boy's crib until I went back over to Jami's apartment.

It was about 4:00 or 5:00 in the morning when I got to Jami's apartment.  I knocked on the door and Jami opened the door and let me in.  I had felt the phone call from Jami was funny, because Jami usually tell[s] me who she has over to her place.  When I got to Jami's apartment, she let me in.  When I got inside the apartment was totally dark inside the apartment.  I could see a dude sitting on the sofa inside the living room.  I could see the guy because of the TV light from the TV.  The guy was a Hispanic dude with short, slick, black hair.  The dude was shorter than me, but he was stocky build.

When I saw the guy, I didn't trip but I was very uncomfortable. Jami sensed that I was uncomfortable. I didn't even sit down.  Jami went to lock the door behind me, and the dude started to get up.  I bolted down the hallway to the back rooms and pushed open the doors to the rooms to the back.  I was trying to see how many people were in the house.  I was trying to turn on some lights, but I didn't know where the switches were.

There was no one else in the apartment.  I went back up to the front of the apartment.  When I got to the front of the apartment, old boy tried to grab me, so I started fighting with him.  I was getting the best of the guy until Jami started helping him Jami grabbed me and started grabbing for my face.  That's when she scratched my face.  I felt like I was being overwhelmed and I didn't have the upper hand anymore, so I pulled my knife.  I pulled my knife and poked the dude with it.  After I poked him -- I don't remember how many times I poked him, he took off.  He opened the door and bolted out of the apartment.  Jami was still there and she was still trying to fight.  She was scratching and grabbing at me and I was still slashing at her.  She grabbed me, so I started poking her. She fell down and I ran out of there.

I ran across the apartment courtyard and was yelling for help. I know that I had cut myself on my finger.  The dude was holding me, so I tried to slice his hand.  He pulled away and I sliced my own finger.  I didn't know I had all that blood on me.  I knew I had some blood on me, but not that much.  I didn't run when the police got there, because I felt like I was a victim.  I was the one being robbed, and I defended myself.  I had no idea how bad I had hurt Jami.  I wouldn't have hurt [her] that bad.  When I walked down the stairs and started to cross the courtyard, the police ran up behind me. They were yelling, stop, or I'll shoot.  I turned around and put my hands in the air.  I told them I had no weapons, but I would not stop walking.  I told them they would have to shoot me if they wanted me to stop walking.

Ten second[s] later after that I got tackled.  The officers cuffed me and one of them pepper sprayed me while I was laying on the ground handcuffed.  I didn't tell the truth in my first statement, because I didn't want to admit that I was buying drugs.  I didn't want that to get out.  This is all I know about this incident, this all happened in the City of San Antonio, Bexar County, Texas.  This is the end of my two-page statement, I have read and understand this statement.  I have signed this statement indicating it's true and correct.  I gave this statement voluntarily without the promise of anything or being threatened.

21

> I felt like I was the victim, so I didn't run, but know that the whole thing was over drugs so I didn't want to reveal that. I felt like it was going to be worked against me.

24 RR 39-43.

Given the above, Preyor's claim must fail. First, Preyor's version of the crime was in the record. Although he could have testified, more than likely his testimony would have been similar to his statement. The Fifth Circuit has held that counsel is not ineffective for failing to present evidence that is cumulative of other evidence. *Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997); *Motley v. Collins*, 18 F.3d 1223, 1228 (5th Cir. 1994); *Lincecum v. Collins*, 958 F.2d 1271, 1280 (5th Cir. 1992).

Second, as a matter of trial strategy, it would not have made any sense for counsel to call Preyor to testify. Had counsel done so, the prosecution would have subjected Preyor to harsh cross-examination. And to the extent Preyor's testimony would have conflicted with his police statement, or any other evidence, the State would have impeached him. For instance, in his police statement, Preyor did not say Jami and Jason were under the influence or that his money was immediately snatched. Because Preyor's statement about acting in self-defense was before the jury, clearly the better tactic was to permit the jury to hear the statement without allowing the prosecution to elicit damaging

testimony in the process. That way, Preyor's statement could speak for itself, and Preyor could leave it to his attorney—a person with experience addressing juries—to explain why the evidence supported the defense. Otherwise, counsel's final summation would have been limited by any harmful admissions from Preyor on cross-examination.

For example, had Preyor testified in accordance with his police statement—that he acted in self-defense and Jami and Jason were the attackers—on cross-examination he would have been forced to explain, among other things: (1) why Jami's door appeared to be kicked in and broken, even though he said she let him inside, 22 RR 34, 85; 23 RR 21-22; SX 8, 37-38, 40-41; (2) why witnesses heard Jami screaming when, at the same time, they saw Jason outside asking for help, 22 RR 87, 117; (3) why he was wearing gloves and brought over a knife (and apparently a shotgun) to Jami's apartment, 23 RR 47-49, 59-62; 24 RR 127-28; (4) why the gloves and knife were found between a fence and the interstate, 23 RR 48-49, 64; (5) why he was not cooperative with the police and had to be tackled and subdued by several officers, 22 RR 47-49, 65-66; (6) why he was the only one who did not have injuries that required treatment, 24 RR 53; (7) why Jami sustained so many wounds, including defensive wounds, whereas he only had a small laceration on one of his fingers, *id.* at 78-80, 70-102; 23 RR 84; SX 92, 97, 107-34; and, most importantly, (8) how

he managed to slice through Jami's right internal jugular vein, left carotid artery, and trachea while merely defending himself.  24 RR 93; SX 97, 125-31.

Further, in his statement, Preyor said that Jason ran out of the apartment after he got stabbed and that Jami continued to fight him.  That begs the following questions: (1) If Preyor was the victim, why did *he* not run out of the apartment immediately?  (2) Once Jason fled, how is it possible that Preyor—a man over six feet tall who once worked as a night club bouncer, 22 RR 100; 23 RR 126—could not fend off and get away from a lone female attacker without brutally slashing her throat, particularly considering that she did not even have a weapon?  (3) Given that Jami did not have a weapon, why would she continue to attack Preyor by herself knowing that he was armed with a knife?  Given these facts and inconsistencies, counsel can hardly be blamed for not placing Preyor on the stand. *See Hollenbeck v. Estelle*, 672 F.2d 451, 454 (5th Cir. 1982) ("It was not unreasonable for counsel to conclude that [the defendant] might do himself more harm than good by attempting to explain how six shots were fired in self-defense."); *see also Jones v. Cain*, 227 F.3d 228, 231 (5th Cir. 2000) ("the decision not to place [the defendant] on the stand in light of his prior criminal history is a judgment call of trial counsel which seldom, if ever, will support a challenge of ineffective assistance of counsel").  Because Preyor's testimony was not required, counsel would have been foolish to let his client do the talking and

24

attempt to explain the unexplainable. *See Pinholster*, 131 S. Ct. at 1403 (to overcome the presumption that counsel rendered adequate assistance, "a defendant must show that counsel failed to act 'reasonabl[y] considering all the circumstances'") (quoting *Strickland*, 466 U.S. at 688).

Third, when the claim is that counsel interfered with a defendant's right to testify, any prejudice inquiry is reviewed pursuant to *Strickland. Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001). In this case, even if counsel was deficient for not calling Preyor to testify, Preyor cannot demonstrate any prejudice. There is no question that Preyor killed Jami Tackett and stabbed Jason Garza because he admitted that in his statement. The only issue is whether this was an act of self-defense. The facts discussed in the paragraphs above demonstrate that it clearly was not.

In addition to that evidence, Jason Garza testified that Preyor, nicknamed "Box," was supposed to come over, but Jason and Jami went to bed. 22 RR 155. When they were almost asleep, Jason heard two or three loud bangs at the door. *Id.* at 159. Then a man peeked into the bedroom, and Jami said: "Box, what the hell are you doing here." *Id.* Preyor, who was dressed in black, said "Fuck this." *Id.* at 160. Preyor started swinging and a fight ensued. *Id.* at 161. At some point, Jason started fighting back and got stabbed. *Id.* at 161-62. He then ran out of the apartment thinking Jami was right behind him. *Id.* at 162. He ran

downstairs and started banging on doors for help. *Id.* at 163. Then he ran back upstairs, and the neighbors were outside. *Id.* One person asked him if he was alright, and Jason looked down and noticed his shirt was covered in blood. *Id.* He sat down on a stair step for a moment and went into a daze. *Id.* While he was sitting there, he heard Jami screaming and then thought he heard her door opening. *Id.* at 164. Thinking Preyor was coming after him, he ran to the front of the complex and rested up against a wall, where the police found him. *Id.* at 164-65. Jason was eventually taken to the hospital and treated for knife wounds to the chest and shoulder. *Id.* at 53, 166, 168-69.

Jason's testimony was consistent with the accounts from the witnesses who lived in the complex. 22 RR 81-87 (testimony from Clara Villanueva), 110-17 (testimony from Jaclyn Villanueva), 136-39 (testimony from Erica Silva). Further, Clara Villanueva stated that when the screaming from Jami's apartment stopped, a man came out dressed in all black with a hood and black gloves. *Id.* at 88. The man went down the stairs, but subsequently came back up and went in Jami's apartment. *Id.* at 88-89. When the man came back up, he was not wearing gloves. *Id.* at 89. The man then exited the apartment again, went down the stairs, and the police confronted him. *Id.* at 90. Jaclyn testified that the man wearing black who went down and back up the stairs was not the young Hispanic man, i.e. not Jason. *Id.* at 120. Clara and Jaclyn then went to

26

Jami's apartment and saw Jami on the floor covered in blood and making

gurgling sounds.  *Id.* at 91-92.  Jaclyn asked Jami if the man who came out of the

apartment wearing all black did this to her, and she kept nodding her head

"yes."  *Id.* at 92-93, 125.  However, Jami was unable to talk.  *Id.* at 125.[7]

Detective Richard Sanchez testified about the condition of the crime scene.

There was a distinct blood trail in the apartment, with bloody footprints leading

out the apartment.  23 RR 7-8.  There was cast off blood on the wall in the

bedroom, which was evidence of someone swinging a sharp object.  *Id.* at 12.  In

addition, there was blood on the bedroom doors, blood leading up to Jami's body,

a pool of blood where her body was lying, heavy blood by the dining area, blood

---

[7]     Noel Ramirez, Jaclyn's boyfriend, testified about the crime from a different perspective.  He stated that when his mother-in-law, Clara, woke him, he looked out the front window and, for a moment, saw a black male wearing a blue outfit and a hood run past.  23 RR 95-96, 110-11.  He then ran to his bedroom window to see if the man was stealing his car.  *Id.* at 97.  Ramirez's car was parked next to what he described as a big truck.  *Id.* at 98.  He saw a man pacing by his car as if he was thinking about stealing the car or running.  *Id.* at 97-98.  Ramirez went outside and first ran into a "Mexican dude," who was saying he was hurt and needed help.  *Id.* at 99.  Ramirez continued to the parking lot, and when he got near his car, he saw a black man dressed in black go to the opposite side of the SUV parked next to Ramirez's car.  *Id.* at 101-02.  Ramirez indicated that this man was different than the man he saw run by the window.  *Id.* at 101-02.  He heard the man cussing and yelling "open the door" and "let me in," although he did not see anyone else in the SUV or get out of it.  *Id.* at 103-04.  Ramirez went back up the stairs and noticed blood on the walls.  *Id.* at 104.  Jaclyn pulled him inside and said, "Hurry up.  He's coming behind you."  *Id.* at 105.  She then said, "That's him, that's him, that's him."  *Id.*  Ramirez went to the window but did not see anyone.  *Id.*  Then he went to the balcony and saw the police arresting someone dressed in all black.  *Id.* at 106-07.  He did not know if the man the police caught was the man he saw by the SUV, but he was dressed the same.  *Id.* at 108.  And he could not identify Preyor as the man he saw.  *Id.* at 116.

on the front door, bloody shoe prints on the carpet, and bloody hand and fingerprints on the door. *Id.* at 15-23. He also found furniture knocked over, wads of hair under a table, and shoe prints with the same pattern. *Id.* at 18-23. Detective Salvador Gomez, who collected the gloves, knife, and shotgun, found blood on the ground next to a Ford Expedition—later identified as Preyor's car—and blood on the driver's side door handle. *Id.* at 46-47.

When Preyor was apprehended, he was covered in blood. 22 RR 50, 66-67, 70; 23 RR 82-84. The pattern on his boots matched the pattern of the boot prints found in the apartment. 23 RR 88; SX 35. DNA evidence showed that Jami's blood was all over Preyor's clothing. 24 RR 130-31. Jami's DNA profile was also consistent with blood found on the knife, gloves, car door handle, a swab from Preyor's face, and a swab from his hand and boot. *Id.* at 127-28, 130. Jason's DNA profile was found on Preyor's watch and knit cap. *Id.* at 130. A mixture of Jami's and Preyor's DNA profiles was located on various items, including a nail clipping from Jami and the swab from Preyor's face. *Id.* at 129-31.

Finally, after the crime, David Pointer, Jami's former boyfriend, found some car keys—keys to a Ford automobile—in her apartment and turned them over to the police. 23 RR 172-73; 24 RR 9, 16. Detective Tom Froelick eventually matched the keys to Preyor's car. 24 RR 17-21.

In sum, the evidence showed that Preyor came over to Jami's fully armed, broke into Jami's apartment, stabbed Jason and murdered Jami, went down to his car, and discarded his gloves and the knife. Then, realizing he left his car keys behind, he went back upstairs but apparently could not locate them. He proceeded downstairs again where he was confronted by the police. He resisted arrest, and the police had to tackle and pepper spray him in order to take him into custody.

Given the totality of this evidence, no jury would have believed Preyor's testimony that he was the victim and acted to defend himself. Counsel was not ineffective for choosing not to call Preyor to testify, and this claim must be denied.

### B. Preyor's claim that counsel was ineffective for failing to investigate and adequately prepare for trial lacks merit and is conclusory.

Preyor claims that counsel's trial preparation amounted to ineffective assistance. He contends that counsel made false statements and representations to the jury in his opening statement by arguing that Preyor was not involved in the crime and was not at the crime scene, despite overwhelming evidence to the contrary. He further complains that counsel suggested in his opening that a third party—David Pointer—was the real culprit even though Pointer had an

alibi.  Preyor argues that this was solely an act of self-defense on his part, and that counsel essentially told the jury the defense would pursue a different theory.  Amended Petition at 16-18.

Although Preyor raised this claim in his abusive state habeas application, he raised a somewhat similar claim in his original application.  The state court found as follows:

> 1.     In his first two claims of ineffective assistance, Preyor claims that counsel failed to conduct investigation and this failure resulted in an incoherent trial strategy.  [1 SHCR 2-3, 8-10].

> 2.     [Preyor] did not call any witnesses or otherwise produce any evidence regarding the actions of trial counsel. With no explanation for the strategy the defense employed, this court finds that Preyor has not overcome the presumption that the actions of counsel were made as part of a reasonable trial strategy.  *See Jackson v. State,* 877 S.W.2d [768,] 771 [(Tex. Crim. App. 1994)].

> 3.     After reviewing the entire record, this court is of the opinion that the defense did have a coherent trial strategy.  And even if the strategy could be viewed as inconsistent, this fact would not render counsel's performance deficient.  In criminal proceedings the burden is upon the State to establish beyond a reasonable doubt that the defendant is guilty of the offense with which he has been charged.  *See Moon v. State,* 572 S.W.2d 681, 692 (Tex. Crim. App. 1978).  The defendant is not required to establish a defense and is entitled to have the jury decide [among] inconsistent defensive theories, even when they might directly contradict one another.  *Booth v. State*, 679 S.W.2d 498, 501 (Tex. Crim. App. 1984).  The jury is afforded the opportunity to accept or reject the various versions of such defenses.  *Id.* at 502.  Therefore, trial counsel would not have been ineffective for pursuing inconsistent defenses in this case.

4.      Furthermore, to the extent that Preyor claims counsel should have done more to investigate and present a defense, he has not produced any evidence that shows what additional investigation would have discovered, nor has he established what other defensive theories should have been pursued.  In the absence of such evidence, there can be no showing of prejudice.

5.      Finally, given the overwhelming evidence of guilt in this case, which includes both eyewitnesses and DNA evidence, as well as the statements of identification made by the victim, immediately proceeding her death, any alleged failure on the behalf of counsel could not have prejudiced the defense as it [would] not have changed the result of the trial.  *See Cantu v. State*, 993 S.W.2d [712,] 718 [(Tex. App.—San Antonio, 1999)].  Therefore, his allegations fail under both prongs of the *Strickland* standard and the court recommends that relief be denied.

1 SHCR 112-13.  To the extent this allegation is not procedurally barred, the state court's decision was not unreasonable.

First, Preyor's allegation contains a falsehood.  In his opening statement, counsel said that Preyor was not guilty of the crime with which he was charged, but at no point did he say Preyor did not do anything and was not at Jami's apartment complex.  22 RR 22-23.  In fact, counsel asserted: "The night in question the testimony will show that Jami was expecting Taichin Preyor to come."  *Id.* at 24.  And at the end of his opening, counsel said:

I want you to look at the condition of [Preyor].  You're going to see that the police have sprayed him with pepper spray and totally disabled him.  His eyes are swollen shut, he has large amounts of mucous coming out his nose.  He is disabled.  I want you to look at

31

the testimony of Noel [Ramirez] when he says, "I saw him over at the car saying, 'Let me in, let me in', talking to a second person".

*Id.* at 27.   Clearly, defense counsel informed the jury that Preyor was at the scene.

Second, Preyor misrepresents, or at the very least exaggerates, counsel's opening remarks.   In his opening, counsel did not say anything that proved to be false.   He first said that Jami was involved with drugs, which was accurate. 22 RR 23; 23 RR 123 (testimony from Priscilla Vallejo), 143-44 (testimony from Jose Perez).   He then discussed her relationship with David Pointer, her ex-boyrfriend, stating that it was abusive—they abused, and fought with, each other.   Counsel further explained that Pointer was obsessed with Jami; that Jami was frightened of him; that he showed up at her door the previous morning and got into her car; that he later came back to her apartment shortly after the murder; that Pointer wound up with Preyor's car keys after the crime, and that Jami's step-father first asked the police whether Pointer committed the crime. 22 RR 23-24.   Again, these statements proved to be true.   22 RR 171-77 (testimony from Jason Garza); 23 RR 130-33 (testimony from Priscilla Vallejo), 165-74, 176-90 (testimony from David Pointer); 24 RR 7-9 (testimony from Jami's step-father, Charles Dickinson).   Next, counsel stated that "there was a lot of partying that night," which included people drinking alcohol, smoking

32

marijuana, and using cocaine at Jami's. 22 RR 24-25. Trial testimony confirmed this. 22 RR 148-55, 181-83 (Jason Garza). Counsel then asked the jury to take note of possible inconsistencies in the State's case regarding how the crime scene looked, and the inability of witnesses to see into Jami's apartment from their own doors. *Id.* at 25-26. Counsel also argued that the State lacked evidence of theft, and that Jason Garza could not identify Preyor. *Id.* at 26. Counsel concluded by noting that Pointer was extremely nervous right after the offense, that the police "disabled" Preyor, and that Clara Villanueva described the man coming out of Jami's apartment as 5' 8". *Id.* at 27.

Therefore, although counsel may have been suggesting that others, namely Pointer, might have some culpability, counsel never unequivocally said someone else committed the crime and Preyor was not there. Essentially, counsel was asking the jury to pay attention to testimony it would ultimately hear. The fact that counsel may have omitted a few points is of no moment, particularly considering that his opening remarks followed the State's opening, in which the prosecutor gave the jury a lengthy and detailed description of its case. 22 RR 11-22.[8]

_____

[8]   The state habeas record does not include an affidavit from Preyor's trial counsel.

33

Ultimately, Preyor's claim fails because "a conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Ward v. Dretke*, 420 F.3d 479, 491 (5th Cir. 2005); *see also Smith v. Quarterman*, 471 F.3d 565, 570 (5th Cir. 2006) ("There is a 'strong presumption' that counsel's conduct 'falls within the wide range of reasonable professional assistance,' and we may 'not find ineffective assistance of counsel merely because [we] disagree[ ] with counsel's trial strategy.'") (quoting *Bell*, 535 U.S. at 698, and *Strickland*, 466 U.S. at 689).   Preyor does not satisfy this standard because he does not explain how exactly he was harmed by counsel's opening remarks.   He also fails to assert what a more thorough investigation would have discovered, or how additional preparation would have worked to his benefit.   *See Gregory v. Thaler*, 601 F.3d 347, 352-53 (5th Cir.) ("An applicant 'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'"), *cert. denied*, 131 S. Ct. 265 (2010) (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)).   Preyor merely argues that counsel made "false statements or representations in opening statements to the jury, defense counsel failed to ensure that the defense would produce a fair trial, a trial whose result would be reliable."   Amended Petition

at 17. This is at best a conclusory allegation of ineffective assistance, which is insufficient to raise a constitutional issue. *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998).

Finally, Preyor surely cannot demonstrate prejudice, let alone that the state court's decision was objectively unreasonable. Defense counsel was in a no-win situation. Counsel was ultimately forced to argue self-defense after Detective Whitson read Preyor's statement—that he acted in self-defense—to the jury. But no jury was going to accept that argument, for the reasons addressed in the section above. Simply put, Preyor was undeniably guilty. And the Fifth Circuit has held that if the facts adduced at trial so overwhelmingly point to the defendant's guilt such that even the most competent attorney would not be likely to obtain an acquittal, any claim challenging counsel's effectiveness must fail. *Jones v. Jones*, 163 F.3d 285, 304 (5th Cir. 1998); *Creel v. Johnson*, 162 F.3d 385, 396 (5th Cir. 1998). For these reasons, Preyor's claim must be denied.

**C. Trial counsel's opening and closing statements were not necessarily inconsistent. To the extent they were, counsel had a legitimate reason for altering his arguments. Moreover, Preyor's claim is conclusory. And given the overwhelming evidence of guilt, Preyor cannot demonstrate prejudice.**

In a related claim, Preyor argues that counsel was ineffective for switching to a defense in closing—self-defense—without presenting any evidence to

35

support it.[9]  He complains that, in his opening statement, defense counsel suggested third-party culpability—i.e. David Pointer may have been the culprit—and that Preyor had an alibi, but then he asked for a self-defense instruction and argued self-defense despite a lack of evidence supporting that position.  Preyor states:

> No reasonably competent criminal defense lawyer would suggest [to] the jury the evidence would show third-party culpability in the opening statement without any evidence to back up such a position, and then with a complete turn-around in summation argue self-defense after having failed to produce any self-defense evidence from the testimony of the defendant or anyone else.

Amended Petition at 22-23.  To the extent this claim is not procedurally barred, this Court must nonetheless reject it.

First, once again, Preyor misrepresents the record.  As explained above, defense counsel never said in his opening statement that Preyor was not at the crime scene, had an alibi, and had nothing to do with the crime.  Moreover, evidence was presented indicating Pointer was, or at least could have been, a suspect.  As shown, everything defense counsel mentioned about Pointer's relationship with Jami Tackett was accurate.  Additionally, there was evidence presented of self-defense: Preyor's statement to the police.  However, that is all

---

[9]     This is Preyor's last, or fifth, ineffective-assistance-of-trial-counsel claim. However, given the similarity of the claim to the one addressed above, the Director believes it is appropriate to address it here.

counsel could have offered because the only people in the apartment were Jami, Jason, and Preyor, and the pitfalls of Preyor testifying have already been explained.

Second, Preyor's claim lacks any understanding or appreciation for the dilemma counsel faced.  As mentioned above, a self-defense theory was not optimal.  Preyor came over armed and was the only one of the three not injured.  The front door was broken, and the horrific wounds to Jami and those to Jason clearly revealed that they were the victims and not the aggressors.  However, once Preyor's statement was admitted toward the end of trial, counsel was left with no choice but to argue self-defense because counsel could not contradict what Preyor himself said.  On the other hand, if counsel had been able to successfully challenge the admission of the statement, culpability by another party—i.e. Pointer—would have been a viable defense.[10]

For example, counsel could have argued that Preyor came over to the apartment as expected and then Pointer—who was also a large man—broke in, attacked the other three, and killed Jami.  That would have explained Preyor's presence at the crime scene and why his DNA was found on some of the items recovered.  Moreover, the witnesses at the complex apparently could not identify

---

[10]     In fact, counsel was successful in objecting to the admissibility of Preyor's statement to Detective John Slaughter.  24 RR 25-27.

the man coming out of Jami's apartment as Preyor.  In fact, Clara Villanueva described the man as 5' 8", not over six feet tall.  22 RR 100.  And given the history between Jami and Pointer, and the fact that Pointer showed up at the crime scene right after the police arrived, this defense would have been more believable than self-defense.[11]   It appears that counsel used his opening statement to keep this option accessible rather than limiting Preyor's defensive theories, which was reasonable under the circumstances.  *See Richter*, 131 S. Ct. at 788 (If there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the state court's denial will be upheld.); *see also Pinholster*, 131 S. Ct. at 1403.  Of course, that strategy was no longer feasible when the trial court overruled counsel's objection to the admission of Preyor's statement and Detective Whitson read it to the jury.  And, "[t]here comes a point where a defense attorney will reasonably decide that another strategy is in order."  *Pinholster*, 131 S. Ct. at 1407.

Third, defense counsel did the best with what he had.  In his closing, counsel argued that Jason, and to a certain extent Jami, instigated the events

---

[11]     Preyor has also claimed that David Pointer had an alibi.  Amended Petition at 17.  Pointer's alibi was that he was at home with his friend Eugene Tamez when the crime occurred.  But on cross-examination, defense counsel pointed out that Tamez was intoxicated that morning and passed out at 3:00 a.m., which would have given Pointer an opportunity to commit the offense without Tamez knowing.  23 RR 186-88.

in question.  Pointing to testimony in the record, counsel said that Jason was intoxicated on alcohol, cocaine, and marijuana, and he was also irritated that David Pointer kept bothering Jami.  For example, counsel stated:

> Jason's motivations really start with David Pointer and his actions, because David Pointer is the one who did some things, cast suspicion upon him, that suspicion was further aggravated by the comments of the stepfather: Did David do this?  That's where you're getting all this stuff about David, because David is estranged from Jami, he is obsessed with her, he goes over, he's calling her all the time.  And what is Jason perceiving?  Jason is perceiving that she's being called all the time.

25 RR 21.  Counsel then noted that Jami was involved with drugs, lacked judgment, and had demonstrated aggressive behavior toward Pointer.  *Id.* at 23. He also noted the testimony of Jose Perez, who said that Jami was in a foul mood that night.  *Id.* at 24.  Preyor then came over, Jami let him in, and she locked the door behind him.  *Id.* at 27.  Preyor was uncomfortable with Jason being there, and ultimately Jason attacked Preyor.  *Id.* ("[Jason's] drunk on drugs, he's wired out, paranoid, he's aggressive, he's mad that David Pointer was there and he sure doesn't want whoever this guy is.").  And with respect to Jami, counsel said, "And I want you to imagine that this is the knife and you have [Preyor] defending himself, trying to restrain her just as David Pointer had tried to restrain her.  That's why I had to bring out that stuff on David Pointer.  He's trying to restrain her and you see bruises."  *Id.* at 30.  Counsel also argued that

39

(1) the evidence indicated a "break out" by Jason Garza, not a "break in" by Preyor; (2) Garza's story about the attack originating in the bedroom did not add up because the photographs of the bedroom did not show evidence of an attack; (3) no burglary occurred; and (4) both Jason and Jami were large people, thus Preyor faced more than a minimal threat. *Id.* at 28-34.

In sum, although counsel did not have much to work with, particularly after the jury heard Preyor's statement, counsel tried to frame the evidence in the best light possible. Although this did not result in an acquittal, Preyor has failed to show that counsel's actions amounted to ineffective assistance. *See Pondexter v. Quarterman*, 537 F.3d 511, 521 (5th Cir. 2008) (trial counsel's tactical decisions do not fall below *Strickland* standards simply because they do not succeed as planned) (citations omitted). Moreover, Preyor is engaging in the type of hindsight *Strickland* disfavors. 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); *see also Black v. Cockrell*, 314 F.3d 752, 754 (5th Cir. 2002) ("A claim of ineffective assistance of counsel must be judged with eyes directly upon the reality of the situation facing defense counsel at the time of the acts and not years later.").

Fourth, even assuming that counsel's trial strategy was inconsistent, Preyor is not entitled to relief.  The Fifth Circuit views complaints of uncalled witnesses unfavorably on federal habeas review because allegations of how a witness would have testified are largely speculative. *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002).  Therefore, "to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citations omitted).

Here, although Preyor argues that counsel failed to present evidence to support a self-defense theory, he does not identify any specific testimony counsel should have offered, except that from Preyor himself.  He does not mention any witnesses who had testimony relevant to the theory; he does not set out the content of any proposed testimony, and he fails to explain how it would have supported his cause.  Further, while Preyor complains at length that counsel made inconsistent arguments, Preyor does not explain what counsel should have done differently.  Therefore, he is raising a claim that is, at best, conclusory. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("In the absence of a specific showing of how these alleged errors and omissions were constitutionally

deficient, and how they prejudiced his right to a fair trial, we [can find] no merit to these [claims].") (quoting *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir.1992)).

Last, Preyor cannot demonstrate any prejudice because, as shown, the evidence of his guilt was overwhelming.  Simply put, there is not a reasonable probability that any defense or additional evidence would have resulted in his acquittal.  The state court's ultimate decision was not objectively unreasonable, and this Court must deny Preyor relief.

### D.   Preyor's claim that trial counsel should have objected to the State's questioning of prospective jurors is procedurally barred, conclusory, and meritless.

Next, Preyor claims that trial counsel was ineffective for failing to object "to the [S]tate's attempt, or effort to indoctrinate, and/or, to inflame the jury causing the trier of fact to be biased and partial toward the [S]tate's position." Amended Petition at 18.  Preyor states:

> The State was not allowed, by law, AND by their own admission, to tell the prospective jurors about the specific facts of this case, yet went on to do so anyway.  Without objecting, the [S]tate told prospective jurors about horrible murders, telling them they would not choose a convicted child molestor to babysit their children, all designed to be bias[ed] and partial against the defendant.
>
> State prosecutors during voir dire used examples of hideous murder cases, both real and a well known motion picture, "A Time

to Kill", to inflame the jury and to arouse their passion in a manner suggesting that the only job the jury had to do was convict the Petitioner and impose the death penalty.

By not objecting to such prosecutorial misconduct, defense counsel failed to ensure the selection of a fair and impartial jury. As a criminal defendant, Petitioner was extremely prejudiced by not having a fair trial by a fair and impartial jury.

Amended Petition at 18-19 (emphasis in original).

First, Preyor's claim must be dismissed because he presented this allegation in his second state habeas application dismissed for abuse of the writ; no similar claim was raised in his initial application. Therefore, the instant claim is procedurally defaulted.

Second, there is no merit to this claim. In order demonstrate that he is entitled to relief because counsel failed to object to particular comments, Preyor must show that the prosecutor's comments rendered the trial unfair. *Jones v. Estelle*, 632 F.2d 490, 492-93 (5th Cir. 1980) (the"failure to object to improper remarks by a prosecutor is not ineffective assistance unless the remarks are so prejudicial as to render the trial fundamentally unfair"). Relief is not warranted unless a petitioner shows that a prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also Ward v. Whitley*, 21 F.3d 1355, 1365 (5th Cir. 1994) (improper argument by prosecutor "warrants reversal on

collateral review only if it had a substantial and injurious effect or influence on the outcome").

The primary flaw with Preyor's claim is that it is void of details and lacks evidentiary support.  Preyor fails to cite to portions in the record where the alleged inflammatory remarks occurred.  He cites to no authority holding that the remarks were improper under state or federal law.  Preyor does not provide any examples of jurors who were affected by the comments.  Indeed, he fails to explain with any specifics how the comments rendered the trial unfair.  All he states is that the prosecution made certain comments; they were egregious in nature, and he was deprived of a fair trial.  This allegation is woefully deficient of any substance and is conclusory.  *United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980) (conclusory allegations of prosecutorial misconduct are insufficient to raise a constitutional claim).  In fact, his allegation appears to be contradictory because he asserts that the prosecutors informed the prospective jurors about the facts of the case but that they actually discussed examples of other cases, some even fictional.

Moreover, there is an initial presumption that a jury is impartial.  *United States v. Ruggierro*, 56 F.3d 647, 652 (5th Cir. 1995).  Preyor has failed to present any evidence to rebut that presumption; he merely leaps to the

conclusion that the comments resulted in a biased jury.  Additionally, the trial court's charge to the jury stated:

> You are instructed that the statements of counsel made during the course of the trial or during the argument, if not supported by evidence, or statements of law made by counsel, if not in harmony with the law as stated to you by the Court in these instructions, are to be wholly disregarded.

25 RR 13.  It is well-settled that jurors are presumed to follow their instructions, *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993); *Richardson v. Marsh,* 481 U.S. 200, 211 (1987), and Preyor has offered nothing to show that the jurors failed to do so in his case.

Last, Preyor cannot demonstrate any prejudice given the facts of the case, as discussed above.  Therefore, this claim is procedurally defaulted, meritless, and, as a result, must be denied.

### E.     Preyor's claim that counsel failed to conduct any voir dire regarding racial bias or prejudice is procedurally barred, conclusory, and foreclosed by Supreme Court and Fifth Circuit precedent.

Preyor contends that trial counsel was ineffective for failing to conduct any voir dire regarding racial bias or prejudice.  Amended Petition at 19-21.  Preyor claims: "Defense counsel asked no such questions on voir dire, and made no requests for the trial judge to so inquire.  Such failure was below that standard

reasonably to be expected of a competent criminal defense lawyer." *Id.* at 20. The only reason Preyor provides for his allegation is that "[t]his was a capital murder case with a black defendant and the alleged victim was a white female." *Id.* at 19.

This Court must reject Preyor's claim. First, it is procedurally barred. Preyor raised this claim in his successive state habeas application that the Court of Criminal Appeals dismissed for abuse of the writ.

Second, Preyor's claim is nothing but conclusory. He does not state what exactly counsel should have asked the prospective jurors to determine whether any were racially biased. He does not point to any portion of the record where any prospective juror indicated he or she was biased. And most importantly, he completely fails to demonstrate that a racially biased person actually sat on the jury. In short, Preyor's claim fails to implicate a constitutional issue.[12]

Third, simply because the defendant and victim were of different races is insufficient to show that such questioning was required, let alone that Preyor

---

[12]     Preyor also alleges that the Supreme Court "has recognized that the failure to inquire on voir dire about the areas of racial bias and prejudice in a capital murder case completely vitiates the legitimacy of the entire jury selection process, and holds that it is reversible error if the trial court prevents the defense from asking such questions." Amended Petition at 20. In support, Preyor refers to *Aldridge v. United States,* 283 U.S. 308, 314-15 (1931). Amended Petition at 34. But in *Aldridge*, the trial court precluded defense counsel from asking questions pertaining to racial bias or prejudice. Preyor does not claim that the same happened in his case.

was deprived of a fair trial.  Relevant to the instant claim, the Supreme Court holds that the question is "whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as 'indifferent as (they stand) unsworne.'" *Ristiano v. Ross*, 424 U.S. 589, 596 (1976) (citation omitted). The Court has specifically rejected a per se rule requiring voir dire on racial prejudice when the defendant and the victim are of different races.  *Id.* at n.8 ("[O]ur heterogeneous society policy as well as constitutional considerations militate against the divisive assumption as a Per Se rule that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion.") (citing *Connors v. United States*, 158 U.S. 408, 415 (1895)).

Preyor's allegation is also foreclosed by Fifth Circuit precedent.  In *Moore v. Butler*,[13] the petitioner alleged that "given his parish's history of racial discrimination against blacks and the interracial nature of his crime, trial counsel's failure to ask a single question during voir dire as to racial prejudice amounted to ineffective assistance of counsel." 819 F.2d at 520.  Moore attached to his petition affidavits from several parish residents claiming that racial prejudice existed in their locale.  *Id.*  The Fifth Circuit rejected Moore's contention for two reasons.  First, "we hold that the combination of a local

---

[13]     819 F.2d 517 (5th Cir. 1987).

history of racial discrimination and an interracial crime, without more, does not mean that trial counsel is deficient in failing to investigate on voir dire the possible racial prejudice of veniremen." *Id.* Second:

> Moore has failed to allege or explain how counsel's "colorblind" (as he styles it) approach during voir dire prejudiced his case, other than by pointing out that he was tried by an all-white jury. Assuming *arguendo* that counsel's voir dire performance was constitutionally deficient, Moore has not come close to showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Id.* at 520-21 (quoting *Strickland*, 466 U.S. at 694).

In *Clark v. Collins*,[14] the petitioner raised an identical claim. The Fifth Circuit "doubted" that counsel's omission amounted to deficient performance, but concluded Clark could not prove prejudice. Specifically:

> While Clark points out that questions regarding racial bias led to the dismissal for cause of at least one venire member, he does not claim that racial bias tainted the petit jury actually impaneled. This claim fails to allege a reasonable probability that, but for his attorney's failure to inquire into racial bias of prospective jurors, his trial would have reached a different result.

19 F.3d at 965.

As shown, Preyor's claim is even less convincing than these. He has failed to show a history of racial bias in Bexar County. He has not offered affidavits

---

[14]   19 F.3d 959, 965 (5th Cir. 1994).

48

from residents proclaiming that bias exists or existed, particularly with regard to interracial crime.  He has not shown that he was tried by an all-white jury, nor has he demonstrated that any jurors were dismissed for racial bias.  And as previously mentioned, he has not shown or even alleged that racial bias tainted the jury impaneled.   Thus, he cannot prove prejudice under *Strickland*. Accordingly, this Court must deny the instant claim.

### III.   Preyor's Claims that Appellate Counsel Was Ineffective Are Procedurally Defaulted and Meritless.

Next, Preyor alleges that appellate counsel was ineffective on direct appeal for not raising the five ineffective-assistance-of-counsel claims addressed above. Amended Petition at 23-26.  He contends that appellate counsel did not raise these claims because of a "conflict of interest," namely that appellate counsel was also Preyor's co-counsel at trial.  Preyor further states that appellate counsel did not raise these claims because he had a personal relationship with the victim's step-father.  *Id.* at 24.

Preyor's allegations must be rejected.  First and foremost, Preyor raised these allegations in his state habeas application dismissed for abuse of the writ. 2 SHCR 1-23.  For the reasons addressed above, his claims are procedurally barred from federal habeas review.  And Preyor does not allege any cause or prejudice to overcome his default.

49

Second, Preyor's claims have no merit.  It is not required that an attorney argue every conceivable issue on appeal, especially when some may be without merit. *Jones v. Barnes,* 463 U.S. 745, 754 (1983).  Indeed, it is his professional duty to choose among potential issues, according to his judgment as to their merit and his tactical approach.   *Id.*  Further, to prevail on an ineffective-assistance claim such as the instant one, a habeas petitioner must demonstrate a reasonable probability that, but for appellate counsel's unprofessional errors, the result of his appeal would have been different.  *Smith v. Robbins,* 528 U.S. 259, 285 (2000); *Lockhart v. McCotter,* 782 F.2d 1275, 1283 (5th Cir. 1986). Appellate counsel's failure to raise certain legal issues on direct appeal does not amount to the ineffective assistance of appellate counsel unless the petitioner can demonstrate that these issues reflected trial errors of arguable or colorable merit. *Robbins,* 528 U.S. at 285; *Hooks v. Roberts,* 480 F.2d 1196, 1198 (5th Cir. 1973).

Appellate counsel was not deficient because, time and again, the Court of Criminal Appeals has pointed out that direct appeal is the inappropriate forum to pursue a claim of ineffective assistance of counsel.  *See Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007) ("As we have said on more than one occasion, a reviewing court on direct appeal will rarely be able to fairly evaluate the merits of an ineffective-assistance claim, because the record on direct appeal

is usually undeveloped and inadequately reflective of the reasons for defense counsel's actions at trial."); *Robinson v. State*, 16 S.W.3d 808, 811 (Tex. Crim. App. 2000) ("we have increasingly noted that, in most cases, the pursuit of [an ineffective-assistance-of-counsel claim] on direct appeal may be fruitless"); *Ex parte Torres*, 943 S.W.3d 469, 475 (Tex. Crim. App. 1997) ("In most instances, the record on direct appeal is inadequate to develop an ineffective assistance claim.").   In fact:

> A substantial risk of failure accompanies an appellant's claim of ineffective assistance of counsel on direct appeal.   Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation.   In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel.

*Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999) (footnote omitted).   Thus, the Court has admonished appellate counsel to not raise this issue on direct appeal.   *Jackson v. State*, 877 S.W.2d 768, 772 (Tex. Crim. App. 1994) (Baird, J., concurring).

More importantly, as shown above, Preyor's ineffective-assistance-of-trial-counsel allegations lack merit, particularly given the facts of the offense and

Preyor's undeniable guilt.  Indeed, several of the claims are just conclusory.[15]
Therefore, appellate counsel cannot be deemed ineffective for failing to raise
these issues.

Finally, although Michael Gross acted as Preyor's co-counsel at trial,
Preyor has provided no proof that this alleged "conflict of interest" influenced the
arguments he raised or did not raise on direct appeal.[16]  Further, at several
places in his amended petition, Preyor states that Gross had a friendly
relationship with Jami Tackett's father, Charles Dickinson, who is actually her
step-father.  Amended Petition at 2, 11, 24, 25.  Preyor alleges that while the
court was in recess at the time of trial, Gross was seen "fraternizing, laughing,
and having a conversation with" Jami's step-father in the attorney conference
room.  *Id.* at 11.  Preyor claims that he first learned of this "conflict of interest"
on February 9, 2009, the date of the state habeas hearing.   *Id.* at 11-12.
However, he provides absolutely nothing to substantiate this allegation.  There

---

[15]     One of Preyor's ineffectiveness claims is that counsel failed to object to the
prosecution's tactics during voir dire.  However, if trial counsel failed to object, the
claim was not preserved for appellate review.  Tex. R. App. Proc. 33.1(a); *Turner v.
State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991).  Thus, the Court of Criminal
Appeals would not have reviewed the claim even if appellate counsel had raised it.

[16]     Michael Gross raised six errors on direct appeal, including challenges to
the admission of photographs, the legal sufficiency of the evidence to prove Preyor was
a future danger to society, and the trial court's decision to not grant the defense's
challenge to the state's striking of a veniremember, pursuant to *Batson v. Kentucky*,
476 U.S. 79 (1986).  *See* Appellant's Brief on Direct Appeal.

is nothing in the record to support it, and he does not even offer an affidavit from the person who supposedly observed this "fraternization."  But even assuming Gross had some contact with Jami's step-father, that would not explain why he did not raise these claims on direct appeal.  More importantly, it would not turn the above claims into meritorious allegations worthy of appellate review.

For these reasons, this Court must reject Preyor's ineffective-assistance of-appellate-counsel allegations and deny him habeas relief.

## IV.   Preyor's Claims Challenging State Habeas Counsel's Performance Are Not Cognizable on Federal Habeas Review.

Finally, Preyor contends that his state habeas attorney rendered ineffective assistance for (1) arguing trial strategy in the state habeas application; (2) failing to produce any evidence at the evidentiary hearing; (3) failing to prepare proposed findings of fact and conclusions of law as ordered by the court; and (4) abandoning him by failing to file a motion to appoint himself or other counsel for purposes of federal habeas review.  Amended Petition at 26-32.  These claims are not worthy of the Court's attention.

Under 28 U.S.C. § 2254(i), "The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."  The Supreme Court has also made clear that a petitioner cannot complain about the

effectiveness of postconviction counsel because petitioners have no constitutional right to such counsel and the states have no obligation to provide collateral review. *Pennsylvania v. Finley*, 481 U.S. 551, 555-57 (1987); *see also Coleman*, 501 U.S. at 752 ("[t]here is no constitutional right to an attorney in state post-conviction proceedings ... [c]onsequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings"). The Fifth Circuit has repeatedly held the same. *Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 1815 (2011); *Ruiz*, 460 F.3d at 643-44; *Elizalde*, 362 F.3d at 330; *Martinez*, 255 F.3d at 240-41; *Beazley v. Johnson*, 242 F.3d 248, 270-72 (5th Cir. 2001). Moreover, "'infirmities in state habeas proceedings do *not* constitute grounds for relief in federal court.'" *Beazley*, 242 F.3d at 271 (emphasis in original) (quoting *Trevino v. Johnson,* 168 F.3d 173, 180 (5th Cir. 1999)); *see also Henderson,* 333 F.3d at 606; *Hallmark v. Johnson,* 118 F.3d 1073, 1080 (5th Cir. 1997); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992).

In short, Preyor's claims are not cognizable and, as a result, there is nothing for this Court to review.

## CONCLUSION

For the above reasons, the Director respectfully requests that Preyor's petition for writ of habeas corpus be denied.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

  /s/ W. Erich Dryden
*W. ERICH DRYDEN

*Attorney-in-Charge      Assistant Attorney General
State Bar No. 24008786

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
(512) 320-8132 (Fax)

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing Answer with Brief in Support has been served electronically to Brandy Estelle, counsel for the Petitioner, on this the 9th day of June, 2011.


 /s/ W. Erich Dryden_____
W. ERICH DRYDEN
Assistant Attorney General