IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TAICHIN PREYOR, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| - vs. - | § | |
| | § | Civil No. SA-10-CA-857-FB |
| LORIE DAVIS, Director, Texas Department | § | |
| of Criminal Justice, Correctional Institutions | § | * DEATH PENALTY CASE * |
| Division, | § | |
| | § | |
| Respondent. | § | |
| | § | |

## *TAICHIN PREYOR IS SCHEDULED TO BE EXECUTED ON JULY 27, 2017*

## MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO RULE 60 OF THE FEDERAL RULES OF CIVIL PROCEDURE

Pursuant to Federal Rules of Civil Procedure 60(d)(3) and 60(b)(6), Petitioner TaiChin Preyor requests relief from the Court's order and final judgment denying his petition for writ of habeas corpus.

### INTRODUCTION

There are cases that present rare fact patterns. And there are those that present egregious facts. Preyor's case is the most uncommon kind of all:  rare, and egregious—as even a former clerk of this Court recognized.

As this Court will remember, Preyor's former counsel of record, Brandy Estelle, was utterly unqualified to represent Preyor in federal habeas proceedings. That is why this Court *denied* her motion to be appointed Preyor's counsel. It is also why the former judicial clerk

1

responsible for death-penalty cases in this Court took the extraordinary step of contacting the Texas habeas bar to find replacement counsel for Preyor after his habeas petition was denied. Replacement counsel, Hilary Sheard, subsequently requested a substantial budget to investigate certain troubling events that she had identified, which this Court approved, although the funds did not become available until May 12, 2017.   What that still-ongoing investigation has uncovered proves that this Court's concerns, and the outreach of its clerk, were well-placed.

Unbeknownst to this Court, Brandy Estelle had help: Philip Jefferson, who had been disbarred years earlier for demonstrating a "gargantuan indifference to the interests of his clients," as the Ninth Circuit put it in a published decision.  It was Philip Jefferson, not Estelle, who solicited the representation of Preyor from his mother, Margaret Mendez, over Thanksgiving dinner in 2007.  It was Jefferson who discussed strategy with Preyor's family members on a near daily basis.  And it was Jefferson who managed Preyor's case, dictating pleadings to Estelle that she later filed in court.  No doubt fearing repercussions, Estelle never disclosed her disbarred co-counsel's lead role in the case to this Court.

Estelle and Jefferson's fraud on the courts did not stop there, however.  After securing court appointment in the Fifth Circuit (following this Court's denial of the same), Estelle also requested compensation for her work in that court and the United States Supreme Court—notwithstanding the fact that Mendez had already paid her and Jefferson over $45,000 to represent Preyor in the same proceedings.  Estelle never told Mendez about these duplicative payments, much less issued her a refund.

Further, just as Estelle fraudulently concealed Jefferson's role in the case from this Court, Estelle and Jefferson concealed Jefferson's disbarment from Preyor and his family.  During his meeting with Mendez over Thanksgiving in 2007, Jefferson presented himself as an esteemed

2

former colleague of Johnnie Cochran (of O.J. Simpson fame). He promised to come out of "retirement"—as he put it—to represent Preyor, and guaranteed that he would get him off of Death Row. Despite repeated interactions with Preyor's family throughout the case, he never mentioned that he had lost his license to practice law over twenty years ago. It goes without saying that Mendez would not have knowingly hired a disbarred attorney to orchestrate her son's efforts to reverse his death sentence.

The result of Estelle and Jefferson's fraudulent scheme was disastrous for Preyor. The pleadings that the duo submitted on his behalf were utterly deficient. The federal habeas petition filed in this court, for instance, was so abysmal that it subsequently became an exemplar, circulated among habeas attorneys, as an example of what *not* to do.

Perhaps the greatest detriment to Preyor's case, however, was Estelle and Jefferson's failure to investigate the sentencing phase of Preyor's trial and identify a compelling claim of ineffective assistance of trial counsel under *Wiggins v. Smith*, 539 U.S. 510 (2003). Although current-appointed counsel's mitigation investigation is still ongoing, it has already uncovered powerful mitigating circumstances—including a childhood marred by physical and sexual abuse and a long struggle with substance addiction—that the jury who sentenced Preyor to death never heard, and that Preyor's state postconviction counsel never uncovered.

Given Estelle and Jefferson's egregious fraud on this Court and the extraordinary circumstances of their representation, this Court should exercise its equitable discretion to set aside the judgment denying Preyor's petition for federal habeas relief and restore Preyor to the position he was in before Estelle and Jefferson fraudulently brought federal habeas proceedings on his behalf. *See Browning v. Navarro*, 826 F.2d 335, 343-344 (5th Cir. 1987) (recognizing courts' inherent power to set aside a judgment for fraud on the court); *Williams v. Thaler*, 602

F.3d 291, 311 (5th Cir. 2010) (holding Federal Rule of Civil Procedure 60(b)(6) provides a "grand reservoir of power to do justice in a particular case." (internal quotation marks and citations omitted)).

## RELEVANT FACTS AND PROCEDURAL HISTORY

### A.  Preyor's Capital Sentencing and State Court Appeals.

In March 2005, a jury of the 290th District Court of Bexar County, Texas, found TaiChin Preyor guilty of murder.  During his trial, Preyor was represented by court-appointed attorneys John Economidy, who was responsible for the guilt phase, and Michael Gross, who handled the sentencing phase.  *See* Ex.1 (Aff. of Hilary Sheard) ("hereinafter Ex. 1") at PREYOR000004 (Economidy File Notes).

Based on their files, Economidy and Gross knew of several red flags indicating that Preyor had experienced severe physical and sexual abuse during his childhood from multiple family members, suffered from alcohol-induced blackouts, and had a history of mental illness and suicidal ideations.  Ex. 1 at PREYOR000024 (Economidy Case Analysis to Gross, Aug. 13, 2004); Ex. 1 at PREYOR000014-17 (Bexar Cty. Jail Med. Records).   In preparing for sentencing, however, Gross largely ignored these glaring issues.  On his single trip to Preyor's home town of New York City, for example, he spent very little time speaking with Preyor's family members—meeting with Preyor's mother, Margaret Mendez, for only one hour.  *See* Ex. 1 at PREYOR000027-33 (Gross Billing Records); Ex. 2 (Aff. of Margaret Mendez ¶ 4) (hereinafter "Mendez Aff.").  Gross did not seek any of Preyor's childhood medical records.  He did not investigate Preyor's report that he was physically abused as a child.  And he did not even attempt to meet with the family member accused of sexually abusing Preyor or otherwise investigate those significant allegations.

In addition to these basic failings, a psychologist and a neuropsychologist retained by the trial counsel—Dr. Joann Murphey and Dr. Joseph Eubanks, respectively—*both* recommended to Gross that he pursue a neurological assessment of Preyor. *See* Ex. 1 at PREYOR00006-13 (Murphey Evaluation, Oct. 14, 2004); Ex. 1 at PREYOR000041-45 (Eubanks Evaluation Feb. 7, 2005). Gross never did. Instead of pursuing these important leads and presenting meaningful mitigation evidence to the jury, Gross decided to emphasize during closing arguments that Preyor came from a good family, Ex. 3 at 16 (Trial Tr. Mar. 14, 2005), leaving the jury wondering how he became the man they had just convicted of murder. The jury never heard about the troubling family dynamics that shaped Preyor's childhood. It never heard about the physical and sexual abuse Preyor suffered. And it never heard about his struggles with drug and alcohol addiction. Lacking any insight into Preyor's wretched childhood and challenges, the jury found a risk of future dangerousness and a lack of mitigating circumstances, and the trial court sentenced Preyor to death. *Id.* at 34.

Gross also represented Preyor on direct appeal to the Texas Court of Criminal Appeals, which affirmed the District Court's judgment and sentence. *Preyor v. State*, No. AP-75,119, 2008 WL 217974, at *6 (Tex. Crim. App. Jan. 23, 2008).

Another court-appointed attorney, Terry McDonald, then filed an initial state application for a writ of habeas corpus. It was a cursory sixteen pages long. *See* Ex. 4 (Appl. for Writ of Habeas Corpus, *Ex Parte TaiChin Preyor*, No. 2004-CR-3602 (290th Tex. Dist. Ct. Bexar Cty. Mar. 8, 2007)). The application raised various grounds for relief—but none of them related to trial counsel's failure to properly conduct a mitigation investigation. Indeed, like Gross before him, McDonald appears to have (again) conducted no mitigation investigation to support Preyor's application. McDonald did not speak to any of Preyor's family members, and in fact

affirmatively *rebuffed* outreach by Mendez and Preyor's brother, Sean.  *See* Mendez Aff. ¶¶ 9-10.  Nor did he ever visit Preyor.  In fact, when Preyor attended an evidentiary hearing granted by the state court—at which McDonald presented no evidence—Preyor asked his counsel, McDonald:  "Who are you?"  *Id.* ¶ 36.

### B.  Philip Jefferson Solicits Business from Preyor.

Deeply unhappy with Preyor's court-appointed attorneys, Preyor's mother, Margaret Mendez, began searching for private representation for her son around early 2007.  Mendez Aff. ¶¶ 12-13; Ex. 5 (Aff. of Rufus "Andrea" White ¶ 5) (hereinafter "A. White Aff.").  As a long-time postal worker in New York City, Mendez did not have ties to the legal community through which she could obtain a reliable referral.  Mendez Aff. ¶¶ 2, 13-15.  She initially searched the Internet and reached out to family members, but was unable to identify anyone who would take the case for less than $150,000.  *Id.*

Eventually her niece, Melanie White, contacted her with a reference:  Philip Jefferson. *Id.* ¶ 16; Ex. 6 (Aff. of Melanie Antoinette White ¶ 6) (hereinafter "M. White Aff.").  Jefferson had represented White's husband, Rufus Andrea White, in a murder case in Los Angeles in the 1980s.  *See* Mendez Aff. ¶ 16; A. White Aff. ¶ 3; *see also* Ex. 7 (Minute Order, *California v. White*, No. A393272 (L.A. Super. Ct. May 21, 1985)).  Jefferson had obtained two hung juries in that case, and, years later, the Whites reached out again to ask if he could help Preyor.  *See* A. White Aff. ¶¶ 3, 6-7; M. White Aff. ¶ 6.

The Whites' timing was propitious for Jefferson, because he needed money.  His financial situation had deteriorated significantly since the 1980s.  Ex. 8 (Aff. of Melody Nelson ¶¶ 7, 10, 12) (hereinafter "Nelson Aff.").  When the Whites contacted him, he was living on SSI and Veterans Administration benefits, and he would often rely on others to support him

financially.  *See* Ex. 9 (Aff. of Oliver Joseph Jefferson ¶¶ 3, 8) (hereinafter "J. Jefferson Aff."); Nelson Aff. ¶¶ 9-11.  He also liked to gamble—a lot.  *See* J. Jefferson Aff. ¶ 4; Nelson Aff. ¶¶ 6, 12.  His gambling problem was so severe that his wife, Melody Nelson, ultimately divorced him for it.  Nelson Aff. ¶¶ 5-6.  By 2008, Jefferson had been evicted from his home in Los Angeles; so he moved to Las Vegas, where he continued to gamble, visiting a casino almost every day. *See* Neslon Aff. ¶ 12; J. Jefferson Aff. ¶ 4.  He maintained his habit even after he developed severe eyesight problems in later years, forcing him to take the bus to the casino.  *Id.* ¶ 12.

Jefferson was not only a financially strained, inveterate gambler, however.  He also had been disbarred from the practice of law.  *See* Ex. 10 at 1 (Order, *In re the Disbarment of Philip Jefferson*, No. S012632 (Cal. Mar. 21, 1990)).  Jefferson's "unconscionable" incompetence is documented in detail in (among other places) a published Ninth Circuit opinion finding that his representation of a defendant in a murder trial was constitutionally deficient.  *See Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994).  As the Ninth Circuit explained, Jefferson had failed to even interview the brother of the defendant, who credibly claimed that he shot the victim that the defendant was accused of killing.  *Id.* at 1454.  The Ninth Circuit concluded that "[i]t is beyond dispute . . . that Jefferson's behavior was unconscionable—above all, because he violated his elementary obligation to inquire into both the facts and the law before determining what was in his client's best interest."  *Id.* at 1460.  The Ninth Circuit explained that this deficient performance was consistent with the course of conduct leading to Jefferson's disbarment, which "reveals a lawyer who is completely indifferent to his clients, a lawyer who in a number of cases did almost nothing to protect his client's interests"[1]  *Id.*

---

[1]  Jefferson represented the defendant, Sheldon Sanders, at Sanders' second trial (following a mistrial) before Jefferson was disbarred in 1990.  *See id.* at 1450 & n.5.

No surprise, then, that the California Supreme Court disbarred Jefferson for having "pursued a course of conduct demonstrating a complete indifference to his legal and ethical duties, to the great detriment of his clients." Ex. 11 at 9 (Findings of Fact, *In re Philip Jefferson*, No. 83-0-11184 (Cal. State Bar Ct. Mar. 9, 1989)).  In its findings, the State Bar of California reviewed eight instances in which Jefferson had received an up-front fee from a client; filed a complaint; and then abandoned the case, resulting in dismissal or other adverse consequences. *Id.* at 2-7.  Less than four years before his disbarment, Jefferson had also been suspended for similarly neglecting his client's case, resulting in mandatory dismissal.  Ex. 12 (Order, *In re Philip Jefferson*, No. Bar Misc. 5154 (Cal. July 23, 1986)).

But the lack of a valid law license did not stop Jefferson from pretending still to be a lawyer.  He continued to advise people in his community on legal matters.  J. Jefferson Aff. ¶¶ 3, 6; M. Nelson Aff. ¶ 17.  And, eager for a rare paycheck, Jefferson seized on the opportunity to represent Preyor.  He first spoke with Mendez by phone, telling Mendez that he was a "retired" lawyer, but that he could assist with Preyor's case.  Mendez Aff. ¶ 17.  Jefferson asked Mendez to collect court documents for him to review.  *Id.*

Jefferson then flew from Los Angeles to Memphis, Tennessee, to meet Mendez over the Thanksgiving holiday at the home of Andrea and Melanie White, where both he and Mendez stayed for a few days.  A. White Aff ¶¶ 6-7; M. White Aff. ¶¶ 6-7; Mendez Aff. ¶ 18; J. Jefferson Aff. ¶ 6.  After Thanksgiving dinner, he met with Mendez alone to discuss Preyor's case.  *Id.* Mendez considered Jefferson to be well-presented, articulate, and persuasive.  Mendez Aff. ¶ 19. But what stuck out most to Mendez were Jefferson's claims regarding his professional experience and connections.  *Id.* Jefferson had a habit of exaggerating his legal career, Nelson Aff. ¶ 13, and this meeting was no exception.  Jefferson boasted that he had worked in Los

Angeles with Johnnie Cochran of O.J. Simpson fame, and claimed that Cochran used to pass him cases that Cochran himself was too busy to handle.  Mendez Aff. ¶ 19; Ex. 13 (Aff. of Nathaniel Johnson ¶¶ 5, 16) (hereinafter "Johnson Aff.").  He also claimed that he was impressive to juries, Mendez Aff. ¶ 19, and would later talk about how people often came to court not to see who would win or lose the cases he tried, but only to see how well he was dressed.  Johnson Aff. ¶ 16. At the Thanksgiving meeting, Jefferson again told Mendez that he would come out of "retirement" to take on Preyor's case.  Mendez Aff. ¶ 21.  And to close out his pitch, he promised that the case would be reversed and Preyor would receive a plea bargain for time served.  *Id.* ¶ 23.

Jefferson said this work could be done for a lump sum of $20,000.  *Id.* ¶ 21.  He also claimed that, due to his status as a "retired" attorney, he needed another attorney—California attorney Brandy Estelle—to assist with filing documents.  *Id.* ¶ 22.  Jefferson gave the impression that Estelle was a hot-shot Beverly Hills lawyer who would be particularly helpful at the United States Supreme Court, where she was admitted.  *Id.*; Johnson Aff. ¶ 10.  He told Mendez that he and Estelle would split the fees.  Mendez Aff. ¶ 24.  Impressed with Jefferson's presentation and credentials, Mendez agreed to hire them both.  *Id.* ¶¶ 22-24.

### C.  Jefferson Orchestrates the Representation of Preyor.

In Jefferson's pitch after Thanksgiving dinner, he omitted a key fact:  his disbarment. Jefferson never mentioned this to the Whites.  A. White Aff. ¶ 10; M. White Aff. ¶ 11.  He never mentioned it to Mendez.  Mendez Aff. ¶ 58.  In fact, he never mentioned this at any point during the representation, despite his regular interactions with Mendez and her family.  *Id.*  Mendez did not learn that Jefferson had been disbarred until early 2015, after the Supreme Court had denied certiorari in Preyor's case, when she spoke to an experienced habeas attorney, Richard Ellis,

about Jefferson's involvement.  *Id.* ¶¶ 43, 57-58; Ex. 14 (Decl. of Richard Ellis ¶ 4) (hereinafter "Ellis Decl.").  Had Mendez known that Jefferson was disbarred, she would not have hired either Jefferson or Estelle to represent Preyor.  Mendez Aff. ¶ 60.

After convincing Mendez to hire him, Jefferson actively participated in Preyor's representation.   In late 2008, while former appointed counsel McDonald's state habeas application was still pending, Jefferson and Estelle filed a successive state habeas petition.  *See* Ex. 15 (Appl./Pet. for Post-Conviction Writ of Habeas Corpus, *In re Preyor on Habeas Corpus*, No. 2004-CR-3602, AP-75119 (290th Tex. Dist. Ct. Bexar Cty. Dec. 1, 2008)).  Both Jefferson and Estelle flew down to San Antonio, at Mendez' expense, to attend the evidentiary hearing on McDonald's state habeas application.   Mendez Aff. ¶ 33; Johnson Aff.  ¶¶ 6-9.   After the hearing, Jefferson went to lunch with Estelle, Mendez, her brother Nathaniel Johnson, and her son Sean Preyor-Johnson.   Johnson Aff. ¶ 9.   That lunch set the tone for Preyor's appeals: Jefferson ran the show, dominating the conversation while Estelle barely said a word.  *Id.*

Throughout the representation, Jefferson spoke with Mendez about her son's case on almost a daily basis.  Mendez Aff. ¶ 25.  Mendez's brother Nathaniel Johnson would often join these calls, which would regularly involve strategic discussions regarding Preyor's case.  Johnson Aff. ¶ 12.  Johnson recalls that Jefferson regularly asked for their opinions regarding what he and Estelle should argue in Preyor's case.  *Id.*  Jefferson continually boasted about his professional expertise and the prospects of securing Preyor's release, claiming that "any person from the pool hall" could get him off.  *Id.* ¶ 17; Mendez Aff. ¶ 23.  Tellingly, Estelle never joined these phone conversations, and Mendez rarely talked to Estelle.   Johnson Aff. ¶ 12; Mendez Aff. ¶ 25.  It is therefore unsurprising that Mendez considered Jefferson to be Preyor's primary and lead counsel.  Mendez Aff. ¶ 28.

And not only did Jefferson seem to be dictating the legal strategy in Preyor's case; he was also literally dictating Preyor's pleadings.   Jefferson, whose eyesight was poor, dictated pleadings directly to Estelle, as well as to Mendez, who then faxed them to Estelle for filing.  *Id.* ¶¶ 28-29, 48.   Johnson heard Jefferson dictate these pleadings to Mendez on at least two occasions.  Johnson Aff. ¶ 13.   During certiorari proceedings at the Supreme Court, for example, Jefferson dictated a petition for rehearing to Mendez over the phone, which she faxed to Estelle. Mendez Aff. ¶ 48; Ex. D to Mendez Aff (Draft Petition for Rehearing June 30, 2014).   The petition that Estelle ultimately filed contained nearly all of the language Jefferson drafted. *Compare id. with* Ex. 16 (Pet'r's Pet. for Reh'g on a Writ of Cert., *Preyor v. Stephens*, No. 13-9151 (July 7, 2014)).

### D.  Estelle Holds Herself Out as Preyor's Sole Attorney.

Given Jefferson's disbarment, it is not surprising that Brandy Estelle presented herself to the courts as the sole attorney representing Preyor.  She was the only attorney who appeared on pleadings in state and federal court, and the only attorney to seek appointment by this Court and the Fifth Circuit.  *See, e.g.*, Dkt. 7 at 7 (declaring that Estelle is "the Attorney for the Petitioner"); Dkt. 19; Appearance Form, *Preyor v. Thaler*, No. 12-70024 (5th Cir. Oct. 31, 2012).  At no point did she disclose she was taking dictation from Jefferson as co-counsel—disbarred though he was.

Estelle had a valid law license, but that is where her capabilities as a Texas death-penalty lawyer ended.  As this Court *itself* recognized, she was utterly unqualified to represent Preyor. *See* Dkt. 20 at 5 (denying Estelle's motion for appointment because the amended habeas petition filed by Estelle "contain[ed] claims which appear to disregard or ignore the provisions of Title 28 U.S.C. § 2254(i)" and showed that she lacked even "minimal familiarity" with applicable state and federal law).  Estelle had been an attorney for only a few years at the time she took on

11

Preyor as a client, and she had never before worked on a capital case. Ex. 1 ¶ 14. She is, in fact, a probate and estate planning attorney and a real estate broker. *See* Ex. 17 (Thomson Reuters, *Brandy Estelle- Upland, CA*, FindLaw.com, http://pview.findlaw.com/lawyer/brandy-estelle/ca/upland/NDg1Mzk0MV8x/PP (last updated Sept. 16, 2014)); *see also* Estelle & Kennedy PLC, *About*, http://www.estellekennedylaw.com/about/ (last visited July 12, 2017) (hereinafter "Estelle & Kennedy PLC, *About*"). Her prior experience as a habeas counsel was limited to just one case: the representation of Demetrius Johnson in California district court, which was not a capital case. *See* Docket, *Johnson v. A.K. Scribner*, No. 2:06-cv-00032-AHM-JTL (C.D. Cal. Jan. 3, 2006). And even in that one case, Estelle's representation was shockingly deficient, missing the deadline to file a notice of appeal and filing a habeas petition with less than two pages of argument. *See* Order Den.Certificate of Appealability at 1-2, *Johnson v. A.K. Scribner*, No. 2:06-cv-00032-AHM-JTL (C.D. Cal. May 21, 2007), ECF No. 24; *see also* Pet. for Writ of Habeas Corpus, *Johnson v. Adams*, No. 2:10-cv-00388-AHM-SH (C.D. Cal. Jan. 20, 2010), ECF No. 1.

Estelle also had never appeared in a case in Texas state court. *See* Ex. 1 ¶ 14. And it appears she relied on *Wikipedia*, of all things, to learn the complex ins and outs of Texas capital-punishment law: her files included a copy of the Wikipedia page titled "Capital punishment in Texas," with a post-it note stating "Research" next to highlighted passages of "Habeas corpus appeals" and "Subsequent or successive writ applications." Ex. 1 at PREYOR000073-94 (*Capital punishment in Texas*, Wikipedia.org, 7-9, https://en.wikipedia.org/wiki/Capital_punishment_in_Texas (visited June 16, 2014)). Notably, Estelle printed this *Wikipedia* page in June 2014—years *after* Preyor's state habeas applications were denied. *Id.*

Estelle herself eventually came to the realization that she and Jefferson needed help.  In 2012, Estelle attended an introductory habeas training conference hosted by the Texas Habeas Assistance & Training Project ("Texas HAT") in Austin, Texas.  *See* Ex. 18 (Decl. of James "Jim" William Marcus ¶ 9) (hereinafter "Marcus Decl.").  Estelle's notes from the conference include such rudimentary observations as "[b]asically, we are the client's last hope" and "[g]et trial counsel's files from them."  *See* Ex. 1 at PREYOR000068-72 (Estelle Notes from Federal Habeas Conference).

### E.  Preyor's Federal Habeas Petition.

Unfortunately for Preyor, by the time Estelle was learning the rudiments of federal habeas law, she and Jefferson had already filed his federal habeas petition.  In October 2010, Jefferson and Estelle filed in this Court a petition for writ of habeas corpus on behalf of Preyor.  *See* Dkt. 1.  Two months later, Jefferson and Estelle filed an "amended" petition that was nearly identical to the original, except for minor changes to the case caption, verification, and certificate of service pages.  *See* Dkt. 7.  The main body of the petition included precisely one case cite and zero record cites.  Indeed, the only discussion of applicable precedents, such as it was, came in a four-page "Memorandum of Points and Authorities" attached to the end of the petition, which summarily identified the holdings of six Supreme Court cases.  *See id.* at 34-37.

Jefferson and Estelle's petition attempted to raise several claims of ineffective assistance of counsel.  *See id.* at 12-13.  As this Court later observed, however, Jefferson and Estelle:

> failed to allege any specific facts which supported petitioner's claims of ineffective assistance (other than unsupported and meritless allegations about jury arguments allegedly made by petitioner's initial trial counsel and alleged discrepancies between the pretrial and trial testimony of prosecution witness Jason Garza).

Dkt. 24 at 4.  Further, Jefferson and Estelle failed to raise any ineffective assistance of counsel claims related to the sentencing phase of the case.  *See* Dkt. 7.  Although Professor James Marcus, who attempted to advise Estelle beginning in March of 2010, had specifically advised Estelle to thoroughly evaluate trial counsel's mitigation investigation, Marcus Decl. ¶ 6, Jefferson and Estelle completely ignored the glaring failure of trial counsel to capitalize on the numerous red flags presented to him in the case file.  In June 2012, this Court denied Jefferson and Estelle's habeas petition.  Dkt. 21.

**F.  Fifth Circuit Appeal and Proceedings at United States Supreme Court.**

Jefferson and Estelle then applied for a certificate of appealability to the United States Court of Appeals for the Fifth Circuit.  Appl. for Certificate of Appealability, *Preyor v. Thaler*, No. 12-70024 (5th Cir. Oct. 30, 2012).  In February 2013, after filing supporting briefs, Estelle also filed a motion for court appointment.  Mot. for Appointment of Counsel Under the Crim. Justice Act, *Preyor v. Thaler*, No. 12-70024 (5th Cir. Feb. 22, 2013).  Less than a week later, and despite this Court's earlier denial of a similar motion, the Fifth Circuit *granted* Estelle's motion for appointment in a one-sentence order.  Order, *Preyor v. Thaler*, No. 12-70024 (5th Cir. Feb. 27, 2013).  In July 2013, the Fifth Circuit denied Jefferson and Estelle's application for a certificate of appealability.  *Preyor v. Stephens*, 537 F. App'x 412 (5th Cir. 2013).

Jefferson and Estelle then filed a petition for writ of certiorari in the United States Supreme Court.  True to form, that Supreme Court petition contained a six-page argument section, cited only a bare handful of cases, and again included no record cites.  Pet. for Writ of Cert., *Preyor v. Stephens*, No. 13-9151 (Dec. 19, 2013).  The Supreme Court denied the petition. *Preyor v. Stephens*, 134 S. Ct. 2821 (2014).  Jefferson and Estelle sought rehearing, which was also denied.  *Preyor v. Stephens*, 135 S. Ct. 34 (2014).

### G.  Estelle Seeks Duplicative Payments from the Federal Courts and Mendez.

Mendez's initial engagement contract with Estelle required that she pay $20,000 to Estelle and Jefferson for their work in Texas state court, United States District Court, and the Fifth Circuit Court of Appeals.   Mendez Aff. ¶¶ 21, 24, 32; Ex. A to Mendez Aff. (Attorney-Client Fee and Engagement Contract).  In April 2008, Mendez paid the $10,000 deposit required by the contract; she subsequently paid the remainder of the $20,000 fee through installments. *See* Mendez Aff. ¶¶ 32-33, 39, 46, 63; Ex. B to Mendez Aff. (Checks and Payment Receipts). Several of these installments were paid directly to Jefferson.  *Id.*  Mendez also made additional payments for expenses, including $5,000 for Estelle to collect files in San Antonio and visit Preyor on death row.   Mendez Aff. ¶ 39; Ex. C to Mendez Aff. (Addendum #2 to Attorney-Client Fee and Engagement Contract).   When the Fifth Circuit denied the relief Jefferson had earlier promised, *see* Mendez Aff. ¶ 46, Jefferson and Estelle demanded that Mendez pay another $20,000 for proceedings at the United States Supreme Court.  *Id.*  In total, Mendez would pay Jefferson and Estelle over $45,000 for their representation of Preyor—much of it from her life savings.  *See generally* Mendez Aff.; Ex. B to Mendez Aff.

Once Estelle secured court appointment from the Fifth Circuit, however, she found a way to nicely supplement that significant fee; she also sought and received compensation *from the Fifth Circuit* for her work in proceedings before the Fifth Circuit and the Supreme Court.  *See* Docket, *Preyor v. Stephens*, No. 12-70024 (5th Cir.) (hereinafter "5th Cir. Docket") (showing Estelle's voucher submissions in November 2013 and September 2014).[2]  Mendez was never told about these duplicative payments, nor did she ever receive a refund.  *See* Mendez Aff. ¶ 46.

---

[2]  Preyor asks this Court to take judicial notice that:  (1) when an appointed attorney submits vouchers for payment for work performed, the court will approve payments for work that the court deems appropriate; and (2) that this process was followed by the Fifth Circuit here,

**H.  Judicial and Legal Community Seek New Counsel for Preyor.**

In December 2014, the former judicial clerk for death penalty cases in the U.S. District Court for the Western District of Texas, Marvin ("Yogi") McKelvey, called Jared Tyler, a Texas habeas attorney.  Ex. 19 (Decl. of Jared Tyler ¶ 2).  In that unusual call—which Tyler describes as a first—McKelvey expressed concern about Estelle's representation of Preyor in his federal habeas proceedings, and explained that he was reaching out himself to seek replacement counsel for Preyor.  *Id.* ¶¶ 3-4.  Tyler was unavailable to take the case himself based on his caseload at the time.  *Id.* ¶ 4.  Texas HAT subsequently searched for a qualified attorney.  Marcus Decl. ¶ 12.

Also in late 2014, Preyor reported to this Court that Estelle "ha[d] dropped [him] at the most critical point of [his] appeals," attaching a letter from Estelle explaining that her firm's services to Preyor "ha[d] been exhausted."  *See* Dkt. 31.  Estelle subsequently filed a motion to withdraw as counsel in the Fifth Circuit, which was granted in February 2015.  Mot. to Withdraw as Counsel, *Preyor v. Stephens*, No. 12-70024 (5th Cir. Feb. 23, 2015).  Meanwhile, following up on McKelvey's request, Texas HAT recruited Hilary Sheard, an experienced habeas attorney, to represent Preyor.  Dkt. 56-3 ¶ 3.  This Court appointed Sheard to represent Preyor in March 2015.  Dkt. 35.

In April 2016, having already conducted some preliminary work on Preyor's behalf and identified further avenues for investigation, Sheard submitted to this Court a proposed budget to cover existing and future expenditures "connect[ed] with the preparation of a clemency petition or any other anticipated filing to be made on [Preyor's] behalf."  Dkt. 40 at 1 (quoting Dkt. 39).  Specifically, Sheard proposed to investigate Jefferson and Estelle's fraud and trial counsel's failure to conduct a proper mitigation investigation—both of which grounds Sheard had

---

resulting in payment to Brandy Estelle pursuant to the vouchers she submitted.  Preyor has submitted *ex parte* and under seal the specifics attendant to this request for judicial notice.

identified from her preliminary inquiries.  Dkt. 38-1.  In June 2016, after considering Sheard's request, the federal magistrate judge recommended a substantial budget—$45,000—for future attorney time, a mitigation specialist, and other expenses.  Dkt. 47.  The magistrate judge noted that the Fifth Circuit budgeting attorney herself had recommended approval, and found that counsel's proposal to investigate Preyor's former representation was "reasonable."  *Id.* at 10.

The budget request, however, was not finally approved by the Fifth Circuit until over a year later, in May 2017.  *See* Dkt. 52.  In the meantime, Sheard, a solo practitioner, was unable to substantially advance her investigation.  *See* Ex. 20 (Letter from Hilary Sheard to Jay R. Brandon July 15, 2016); Ex. 21 (Letter from Hilary Sheard to Jay R. Brandon Sept. 9, 2016).  On May 16, 2017, this Court appointed Catherine E. Stetson and Mark Olive to support Sheard as co-counsel for Preyor.  Dkt. 58.  With the budget approved, appointed counsel continued the investigation into Jefferson and Estelle's fraud and began uncovering extensive mitigation evidence, which Preyor's former attorneys had failed to pursue.  *See, e.g.*, Dkt. 67 at 8-10.  This Motion follows.

## ARGUMENT

### I.    The Court Must Set Aside the Judgment on Preyor's Habeas Petition Because His Former Attorneys Committed Fraud on the Court.

Federal courts have inherent equitable authority to set aside, at any time, a judgment that is tainted by fraud perpetrated on the court, including fraud committed by the movant's own attorney.  *See* Fed. R. Civ. P. 60(d)(3); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991); *Browning v. Navarro*, 826 F.2d 335, 343-344 (5th Cir. 1987) (citing examples of fraud on the court perpetrated by the movant's own attorney); *Jackson v. Thaler*, 348 F. App'x 29, 34 (5th Cir. 2009) (considering claim that movant's own attorney committed fraud on the court).  This authority "is necessary to the integrity of the courts," *Chambers*, 501 U.S. 32 at 44, and "fulfill[s] a universally recognized need for correcting injustices which, in certain circumstances,

are sufficiently gross to demand a departure from rigid adherence" to the finality of a judgment. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944)).

The Fifth Circuit has described fraud on the court as the kind of fraud that "does or attempts to defile the court itself," *Wilson v. Johns-Manville Sales Corp.*, 873 F.2d 869, 872 (5th Cir. 1987) (quoting *Kerwit Med. Prods. v. N. & H. Instruments Inc.*, 616 F.2d 833, 837 (5th Cir. 1980)) and that "has the effect of foreclosing to [a party] the opportunity to have a fair and complete trial," *Browning*, 826 F.2d at 345. There is no strict time bar on an action to set aside a final judgment for fraud on the court. *See Hazel-Atlas*, 322 U.S. at 244; *Jackson*, 348 F. App'x at 34. Indeed, as one of the court's inherent equitable powers, "the power to vacate for fraud on the court" is largely "free from procedural limitations." *United States v. Estate of Stonehill*, 660 F.3d 415, 443 (9th Cir. 2011) (quoting 11 Charles A. Wright & Arthur R. Miller, Fed. Practice & Proc. § 2870 (2d ed. 1987)).

### A.   Estelle and Jefferson Committed an Egregious Fraud on the Court.

Estelle and Jefferson's fraudulent scheme, to put it mildly, tarnished the integrity of this Court and of the Fifth Circuit. Throughout Preyor's federal habeas proceedings, Estelle intentionally misrepresented to this Court that she was the sole and lead attorney for Preyor. She was the only attorney of record, the only attorney to sign pleadings filed in this Court, and the only attorney who sought court appointment to represent Preyor. *See, e.g.*, Dkt. 7 at 38 (declaring that Estelle is "the Attorney for the Petitioner"); Dkt. 19 (motion to appoint Estelle as counsel). In reality, however, Estelle took a back seat to Jefferson, who had been disbarred for more than twenty years by the time Preyor's federal habeas petition was filed. *See* Ex. 10 at 1 (Disbarment Order). It was Jefferson, not Estelle, who originally solicited the engagement from Preyor's mother over Thanksgiving dinner in 2007; it was Jefferson who developed case strategy

with input from Preyor's family; and it was Jefferson who crafted pleadings filed in Court, dictating them over the phone to Estelle directly or through Mendez. *See* Mendez Aff. ¶¶ 18, 21, 25, 28-29, 48; Ex. D to Mendez Aff. (Notes of M. Mendez); A. White Aff. ¶¶ 6-7; M. White Aff. ¶¶ 6-7; Johnson Aff. ¶¶ 12-13. Unbeknownst to this Court, therefore, the advocacy for Preyor was not the work of a licensed attorney, but the result of Jefferson's unlicensed and illegal practice of law.

Estelle's fraudulent misrepresentations not only defiled the court itself, but also precluded the Court from effectively "perform[ing] in the usual manner its impartial task of adjudging cases." *Wilson*, 873 F.2d at 872 (quoting *Kerwit Medical Prods.*, 616 F.2d at 837). In our adversarial system, courts depend on qualified attorney representation from each side to sharpen the issues and inform their decisions. Jefferson's critical, but hidden, role in the case, deprived this Court of that critical component of the process. For had Jefferson's involvement been disclosed to this Court, this Court almost certainly would have used its inherent regulatory authority to prevent Estelle—and therefore Jefferson—from appearing *pro hac vice* on Preyor's behalf. *See* W.D. Tex. Local Rule AT-1(f)(1) (2009) (admission *pro hac vice* requires "permission of the judge presiding."); W.D. Tex. Local Rule AT-7-1(d) (2009) ("[A]ny judge . . . has inherent authority to discipline an attorney who appears before him or her."). This Court then could have ensured that a *licensed* and competent attorney presented Preyor's claims, presumably backed by the legal analysis and factual support that Estelle and Jefferson utterly failed to muster. *See supra*, Section I.E.-F. (detailing deficiencies).

Estelle's complicit role in this fraud cannot be chalked up to a misunderstanding; viewed most charitably, it was willful blindness. It was well known in the Los Angeles legal community that Jefferson had been disbarred; he went down in spectacular, published, and public fashion.

*See Sanders*, 21 F.3d at 1455.   Moreover, Estelle and Jefferson shared mutual professional contacts who would have known of Jefferson's disbarment.   Estelle's law partner, Michael Kennedy, for example, has worked as a "peace officer" for California's juvenile justice entity, the California Youth Authority, which provides funding to the Sugar Ray Youth Foundation, a non-profit for which Jefferson once served as the director.   *See* Estelle & Kennedy PLC, *About*, http://www.estellekennedy.com/about/ (last accessed July 14, 2017); *see also More Than 2,500 Mourners Honor Sugar Ray Robinson*, Jet Magazine 55 (May 8, 1989), *available at* https://goo.gl/DGXK2U.  Perhaps the clearest indication of Estelle's knowledge, however, is that she *never listed her co-counsel* on *any* pleading, or otherwise discussed his work on the case to other attorneys.   *See* Marcus Decl. ¶ 10 (noting Estelle never mentioned Jefferson in any of their interactions, including at a habeas conference in 2012).

Estelle's and Jefferson's misrepresentations about Jefferson's role in the case alone warrant relief.   But the scheme did not stop there.   Estelle also defrauded the courts herself by seeking compensation for work for which she and her "co-counsel" had already been paid. Preyor's mother paid them to represent Preyor in the state courts, federal district court, the Fifth Circuit, and the United States Supreme Court.   Mendez Aff. ¶¶ 21, 24, 32; Ex. A to Mendez Aff. (Attorney-Client Fee and Engagement Contract).   Nonetheless, Estelle sought from the Fifth Circuit compensation for work on the same proceedings.   *See* 5th Cir. Docket.   Such fraud undermines the public's confidence in the integrity of the federal court system—and in particular the use of government funds to ensure adequate representation of prisoners sentenced to death.

Because Estelle and Jefferson's fraud both defiled the court system and "undermined the workings of the adversary process itself," *Stonehill*, 660 F.3d at 445, their scheme rises to the level of fraud on the court.   This Court should therefore exercise its inherent equitable authority

to set aside the judgment on Preyor's federal habeas petition, allowing him a full and fair opportunity to pursue federal habeas relief. *See Browning*, 826 F.2d at 345.

### B. Setting Aside the Judgment for Fraud on the Court is Consistent with AEDPA.

The Supreme Court has warned that some motions under Rule 60 may effectively assert "claims" for federal habeas relief, and therefore must comply with the restrictions on successive habeas petitions under 28 U.S.C. § 2244. *Gonzalez v. Crosby*, 545 U.S. 524, 530, 532 (2005). Rule 60 motions raising a procedural defect in prior habeas proceedings, however, are "true" Rule 60 motions, which courts are free to grant without undermining congressional intent to limit successive habeas petitions. *Id.* at 532. The Supreme Court has expressly recognized—in no uncertain terms—that fraud on the court is one such procedural defect. *Id.* at 532 n.5; *see also In re Coleman*, 768 F.3d 367, 371-372 (5th Cir. 2014) (procedural defects include "[f]raud on the habeas court" (citing *Gonzalez*, 545 U.S. at 532 n.5)). A fraud perpetrated on the court relates solely to the integrity of federal proceedings, not the validity of the underlying state conviction. Preyor's request to set aside the judgment on his federal habeas petition for fraud on the habeas court therefore does not constitute a successive habeas petition.

Once the prior judgment is set aside and Preyor, of course, should and will have full and fair opportunity to present his claims for federal habeas relief in a new petition, even though this Court has already resolved a previous petition. But that is the natural consequence of a Rule 60 motion seeking relief for a procedural defect. The Supreme Court nonetheless singled out just these fraud-on-the-court motions as a quintessential example of a request that does *not* trigger the successive-filing restrictions under 28 U.S.C. § 2254. *Gonzalez*, 545 U.S. at 532 n.5. The opportunity to pursue a new habeas petition, therefore, cannot be a basis to treat Preyor's motion as a successive petition.

Nor does the possibility that Preyor's petition will raise new claims for federal habeas relief require this Court to treat Preyor's motion as a "successive" petition.  Indeed, allowing Preyor to raise any and all claims in a new federal habeas petition is consistent with the purpose of AEDPA.  Section 2254 guarantees state prisoners at least one opportunity to seek federal habeas relief.  *See* 28 U.S.C. § 2254.  But "a decision produced by fraud on the court is not in essence a decision at all and never becomes final."  *Kenner v. C.I.R.*, 387 F.2d 689, 691 (7th Cir. 1968); *see also* 11 Wright & Miller, Fed. Practice & Proc. § 2870 at 409 (1995) (quoting *Kenner*, 387 F.2d at 691).  In other words, because Preyor's previous federal habeas proceedings were procedurally tainted by his counsel's fraud, he is effectively in the same position as a prisoner who has not yet filed a federal habeas petition.  A new habeas petition by Preyor, regardless of the claims raised therein, thus would not conflict with the restrictions on "successive petitions" under § 2244.  *See Workman v. Bell*, 227 F.3d 331, 335 (6th Cir. 2000) (en banc) (fraud on the court "calls into question the very legitimacy of the judgment," which satisfies "at least in spirit, the requirements of section 2244.").  To the contrary, it would advance Congress' intent to allow prisoners one full opportunity to seek federal habeas relief.  *See* 28 U.S.C. § 2254.

To protect Preyor's right to federal habeas review and to remedy Estelle and Jefferson's egregious fraud on this Court, this Court should set aside the judgment on Preyor's federal habeas petition.

## II.    The Fraudulent Representation by Preyor's Former Attorneys is an Extraordinary Circumstance that Requires Reopening His Federal Habeas Petition Under Rule 60(b)(6).

Rule 60(b)(6) is a "'grand reservoir of equitable power to do justice in a particular case.'" *Williams v. Thaler*, 602 F.3d 291, 311 (5th Cir. 2010) (quoting *Hesling, v. CSX Transp., Inc.*, 396 F.3d 632, 642 (5th Cir. 2005)); *see also Menier v. United States*, 405 F.2d 245, 248 (5th Cir.

1968) (recognizing the "wide equitable force and effect for Rule 60(b)(6)"). The rule recognizes that, while finality of judgments is of crucial importance, "the justice function of the courts demands that it must yield, in appropriate circumstances, to the equities of the particular case in order that the judgment might reflect the true merits of the cause." *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. 1981); *see also Fackelman v. Bell*, 564 F.2d 734, 736-737 (5th Cir. 1977) (Rule 60(b)(6) "is a flexible tool designed to do substantial justice."). The Fifth Circuit has therefore instructed that the rule "should be liberally construed." *Seven Elves*, 635 F.2d at 401.

To determine whether "extraordinary circumstances" warrant relief under Rule 60(b)(6), courts may consider a variety of factors. *Buck v. Davis*, 137 S. Ct. 759, 778 (2017). These include "the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process." *Id.* (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-864 (1988) (internal quotation marks omitted)). Other factors identified by the Fifth Circuit and potentially relevant here include "whether the motion was made within a reasonable time," "whether if the judgment was rendered after a trial on the merits the movant had a fair opportunity to present his claim or defense," and "whether there are intervening equities that would make it inequitable to grant relief." *Seven Elves*, 635 F.2d at 402. The court's inquiry is thus highly fact-intensive, requiring careful assessment of the particular equities of each case. *See Gonzalez*, 545 U.S. at 540 (Stephens, J. dissenting) (observing "the equitable, often fact-intensive nature of the Rule 60(b) inquiry").

### A. Jefferson and Estelle's Fraudulent Representation of Preyor is an Extraordinary Circumstance.

Jefferson and Estelle's shocking conduct is exactly the kind of extraordinary circumstance that warrants this Court's intervention. Jefferson and Estelle not only deceived this

Court, *see supra* Section I, but also fraudulently obtained Preyor and his mother's consent to represent Preyor in this case.  In need of money to fund his gambling habit, Jefferson flew across the country to persuade Preyor's mother to hire him for the case.  *See* Mendez Aff. ¶ 18; A. White Aff. ¶¶ 6-7; M. White Aff. ¶¶ 6-7; Nelson Aff. ¶¶ 5-6, 12; J. Jefferson Aff. ¶¶ 4-5.  He presented himself as a highly accomplished attorney, a colleague of the late Johnnie Cochran, who could easily get Preyor off death row.  Mendez Aff. ¶¶ 19, 21, 23; Johnson Aff. ¶¶ 5, 16-17. And he repeatedly described his accomplice, Brandy Estelle, as a hot-shot Beverly Hills attorney with coveted access to the United States Supreme Court.  Mendez Aff. ¶ 22; Johnson Aff. ¶ 10. Given her lack of experience with the legal system and trust in a family member's referral, Mendez reasonably believed Jefferson's claims.

In fact, as appointed counsel's investigation has uncovered, *both* Jefferson and Estelle were completely unqualified to take on Preyor's case.  Jefferson had lost his license to practice law in 1990, and had a history of exhibiting a "gargantuan indifference to the interests of his clients."  *Sanders*, 21 F.3d 1455 .  Estelle, for her part, was not a hot-shot Beverly Hills attorney; she was a real estate and probate lawyer with no experience whatsoever in capital cases, who relied on *Wikipedia* as a resource.  *See* Ex. 17 (Findlaw.com Search); Ex. 1 ¶ 14, Ex. 1 at PREYOR000073-94 (Wikipedia article); Marcus Decl. ¶ 4.  Had Mendez known that Jefferson had been disbarred and that Estelle was utterly unqualified, she would never have hired them to represent her son.  Mendez Aff. ¶ 60.

Jefferson and Estelle's fraud was far from harmless.  It resulted in a disbarred attorney orchestrating Preyor's representation, even dictating pleadings that were subsequently filed in Court.  Mendez Aff. ¶ 28-29, 48; Johnson Aff. ¶ 13.  And as this Court is well aware, Jefferson and Estelle's advocacy on behalf of Preyor was abysmal.  To name just a few examples, their

federal habeas petition included no record cites, only a handful of case citations, and reflected no extra-record investigation whatsoever. And as this Court itself observed, the petition also demonstrated a misunderstanding of the clear and easily identifiable statutory provision prohibiting courts from granting habeas relief on the basis of ineffective assistance of postconviction counsel. *See* Dkt. 20 (denying Estelle's motion for court appointment). Indeed, their work was so deficient that the former death penalty clerk for this Court reached out on his own volition to find qualified replacement counsel in December of 2014. Tyler Decl. ¶¶ 3-4. And, according to Richard Ellis, an experienced habeas attorney, the petition was actually shared among his colleagues as an example of what *not* to do. Ellis Decl. ¶ 2.

Jefferson and Estelle, through their fraud, deprived Preyor of his best opportunity to obtain federal habeas relief from his sentence of death. If there is any case in which setting aside the judgment is necessary "to do justice," *Williams*, 602 F.3d at 311 (internal quotation omitted), it is this one. This Court should exercise its equitable discretion to reopen Preyor's federal habeas proceedings and allow him to pursue his claims through qualified, competent counsel.

### B. Preyor is Not Bound by Estelle and Jefferson's Actions and Omissions.

The extraordinary circumstances warranting relief from the judgment in this case involve far more than Estelle and Jefferson's deficient performance—although they are certainly guilty of that. What makes this case extraordinary is the duo's outright fraud. Nonetheless, Preyor anticipates that the Director will argue that this Court cannot grant relief because errors by a petitioner's attorney are generally insufficient to give rise to extraordinary circumstances warranting relief under Rule 60(b)(6). *See Wells v. United States*, 2007 WL 2192487, at *2 (N.D. Tex. 2007). The reason is that a habeas petitioner is ordinarily bound by the acts of a

lawyer-agent, including any negligent actions or omissions.  *See Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-634 (1962).

But there is an exception to this general rule:  where there is no valid agency relationship between attorney and client.  *See Maples v. Thomas*, 565 U.S. 266, 282-283 (2012) ("[U]nder agency principles, a client cannot be charged with the acts or omissions of an attorney who has abandoned him."); *see also Holland v. Florida*, 560 U.S. 631, 651 (2010) ("[P]rofessional misconduct . . . could . . . amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling.").  As the Supreme Court observed, "[c]ommon sense dictates that a litigant cannot be held constructively responsible for the conduct of an attorney who is not operating as his agent in any meaningful sense of the word."  *Holland*, 560 U.S. at 659 (Alito, J. concurring) (citing *Coleman*, 501 U.S. at 752-754 (relying on "well-settled principles of agency law" to determine whether attorney error was attributable to the client)).

Here, Jefferson and Estelle were not operating as Preyor's agent "in any meaningful sense of the word."  *Id.*  To begin with, Jefferson and Estelle fraudulently induced Preyor and his mother's agreement to hire them, negating any semblance of informed consent.  This deprived the agency relationship of legal effect from the outset.  *See* Restatement (Second) of Agency § 376 (recognizing that fraud may deprive an agency relationship of legal effect); *see also* Restatement (Second) of Contracts § 164 ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.").  Moreover, in light of Estelle and Jefferson's fraud, it can hardly be said that Preyor entered into the agency relationship voluntarily.  Estelle and Jefferson's subsequent actions therefore cannot be binding on Preyor. *See Jones v. Stephens*, 998 F. Supp. 2d 529, 533 (N.D. Tex. 2014) ("[T]he agency rule that

makes a client responsible for his lawyer's acts or omissions is founded on, at least, a voluntary relationship.").

Second, under Texas law, agreements that violate statutes or public policy, including the public policy expressed in the Texas Disciplinary Rules of Professional Conduct, are unenforceable.[3] *Johnson v. McLeaish*, No. 05-94-01673-CV, 1995 WL 500308 at *3 (Tex. App., Dallas Aug. 23, 1995) (not designated for publication); *Cruse v. O'Quinn*, 273 S.W.3d 766, 775 (Tex. App., Houston 2008) ("[A] court may deem these rules [of professional conduct] to be an expression of public policy, so that a contract violating them is unenforceable as against public policy."). Given Jefferson's solicitation of the representation and his active involvement, the agreement for Estelle to represent Preyor clearly contemplated Jefferson's unauthorized practice of law, and Estelle's assistance with the unauthorized practice of law, contrary to the Rules of Professional Conduct and Texas law. *See* Tex. Disciplinary R. of Prof. Conduct § 5.05; Tex. Gov't Code. Ann. § 81.101(a) (prohibiting the unauthorized "practice of law," defined to include "preparation of a pleading" and "the giving of advice or the rendering of any service requiring the use of legal skill or knowledge"); *Fadia v. Unauthorized Practice of Law Comm.*, 830 S.W. 2d 162, 165 (Tex. App., Dallas 1992) ("The selling of legal advice is the practice of law."). It was therefore invalid, and cannot be enforced against Preyor to find an agency relationship here. *Cf. Holland*, 130 S. Ct. at 2563 (noting that "professional misconduct" can "amount to egregious behavior and create an extraordinary circumstance").

---

[3] Because the contract is for legal services to be performed in Texas courts, it is governed by Texas law. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 679 (Tex. 1990) ("[T]he gist of the agreement in this case was the performance of personal services in Texas. As a rule, that factor alone is conclusive in determining what state's law is to apply.")

Thus, like a petitioner who has been abandoned by counsel, Preyor cannot be held responsible for the grossly negligent acts and omissions of his former attorneys.  This is the rare and extraordinary circumstance in which the very foundation of Jefferson and Estelle's relationship with Preyor was fraudulent.  Recognizing the invalidity of the agency relationship here therefore will not undermine the salutary rule that a party is generally bound by the acts of their attorney.  *Cf. Baldayaque v. United States*, 338 F.3d 145, 152 (2d Cir. 2003) ("It is not inconsistent to say that attorney error *normally* will not constitute the extraordinary circumstances required to toll the AEDPA limitations period while acknowledging that at some point, an attorney's behavior may be so outrageous or so incompetent as to render it extraordinary." (Emphasis in original)).  This Court should thus apply its equitable discretion to reopen Preyor's federal habeas petition to allow him to pursue his claims through qualified counsel.  *See Holland*, 560 U.S. at 650 (emphasizing the "flexibility inherent in equitable procedure," which "enables courts to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices." (quoting *Hazel-Atlas Glass Co.*, 322 U.S. at 248) (internal quotation marks omitted) (omissions in original)).

## C. Preyor's Request for Relief Under Rule 60(b)(6) Is Not a Successive Habeas Petition.

Preyor's request to reopen his judgment under Rule 60(b)(6) is a "true" Rule 60 motion, not a successive petition subject to the restrictions of 18 U.S.C. § 2254.  Preyor "attacks not the substance of the federal court's resolution of a claim on the merits, but [a] defect in the integrity of the federal habeas proceeding," *Gonzalez*, 545 U.S. at 532—namely, his attorney's fraudulent inducement of his permission to represent him in court, resulting in the active participation of a disbarred attorney, Philip Jefferson.  Further, Preyor's motion does not rely on a run-of-the-mill attack on "his habeas counsel's omissions, [which] ordinarily does not go to the integrity of the

proceedings." *Id.* at 532 n.5.  Rather, Preyor's motion is premised on Jefferson and Estelle's fraud, which denied Preyor the right to select qualified counsel.

Further, Preyor may bring new claims once his petition is reopened without triggering the restrictions on successive petitions in § 2244.  As discussed, Preyor is not bound by the actions of Jefferson and Estelle, who procured their representation through fraud.  *See supra* Section II.B.  Thus, neither Preyor nor an authorized agent has ever submitted claims for federal habeas relief on his behalf.  For purposes of § 2244, he is in the same position as a petitioner who has not yet filed a federal habeas petition.

Moreover, the Supreme Court has held that a Rule 60 motion is not a successive petition if it ultimately seeks to raise a claim previously barred from review by a procedural defect, including misapplication of the statute of limitations or procedural default.  *See Gonzalez*, 545 U.S. at 533; *In re Coleman*, 768 F.3d at 372.  The same logic applies here.  Just as a petitioner may raise a claim previously barred from review by misapplication of the statute of limitations, or a procedural default for which there was "cause" to overcome, Preyor is free to raise claims that were precluded from this Court's review by the procedural defect at issue here—Jefferson and Estelle's fraudulent representation.  Reopening Preyor's federal habeas petition to address this claim is therefore consistent with the purpose of § 2244 to limit a petitioner to one full bite at the apple.

### D.  Preyor's Request for Rule 60(b)(6) Relief Is Timely.

This motion has been made within the "reasonable time" required by Rule 60.  "Timeliness is measured as of the point in time when the moving party has grounds to make a Rule 60(b) motion, regardless of the time that has elapsed since the entry of judgment."  *Clarke v. Davis*, 850 F.3d 770, 780 (5th Cir. 2017) (quoting *First RepublicBank Fort Worth v. Norglass,*

*Inc.*, 958 F.2d 117, 120 (5th Cir. 1992) (alterations omitted)).  A Rule 60(b)(6) motion is timely made when there is "no indication that the movant was aware of the basis for making the motion yet sat idly by,"  *First RepublicBank*, 958 F.2d at 120 (citing *United States v. 119.67 Acres of Land*, 663 F.2d 1328 (5th Cir. 1981)), or when "good cause can be shown" for any delay.  *Davis*, 850 F.3d at 780 (quoting *In re Osborne*, 379 F.3d 277, 283 (5th Cir. 2004)).  The Court measures timeliness not from the moment that it first becomes conceivable that grounds for relief might exist, but rather when the party learns that the grounds do in fact exist.  *See Dunlop v. Pan Am. World Airways, Inc.*, 672 F.2d 1044, 1051 (2d Cir. 1982), *cited in First RepublicBank*, 958 F.2d at 120 (ruling that a Rule 60(b)(6) motion was timely when filed within four months of an adverse state court decision in a related case, despite the possibility of the adverse ruling existing for two years before).[4]

As detailed above, both the existence and the extent of the extraordinary circumstances warranting relief here were obscured by the very nature of those circumstances:  a concerted effort to defraud both the client and the courts.  The grounds for this motion—Estelle and Jefferson's extraordinary history of illegal and unethical conduct—were not known until new counsel could conduct a full investigation.  That investigation was effectively put on hold for over a year while this Court and the Fifth Circuit considered counsel's request for investigative resources.  Counsel did not receive those resources until May 12, 2017, nine weeks ago.  *See* Dkt. 57.  The weeks-long period between the resumption of counsel's investigation and the filing of this motion is certainly well within a "reasonable" time for new counsel to assess the status of a death penalty case and develop the factual basis for this motion.

---

[4]  This motion is unique when compared to many of the Fifth Circuit's precedents governing Rule 60 timeliness in the habeas context, as the grounds for relief here require a fact-intensive inquiry into the conduct of prior counsel and not simply the recognition of a change in decisional law.  *See, e.g.*, *Davis*, 850 F.3d at 780-783; *Tamayo v. Stephens*, 740 F.3d 986, 991 (5th Cir. 2014); *In re Jasper*, 559 F. App'x 366, 372 (5th Cir. 2014).

Even if the Court were to look to the earliest time Preyor knew at least some aspects of his counsel's fraudulent activities, the motion is still made within a reasonable time because, upon learning of Jefferson's disbarment, Preyor and his new counsel did everything but sit idly by. Preyor's mother did not learn that Jefferson had been disbarred until early 2015, after the Supreme Court denied Preyor's petition for certiorari. *See* Mendez Aff. ¶ 58. This Court appointed new counsel shortly thereafter. Dkt. 35. Preyor's new counsel worked zealously to assess the case and to investigate the facts of Estelle and Jefferson's fraudulent representations, reviewing files from multiple jurisdictions and obtaining records from several courts. *See* Dkt. 38-1; Ex. 20 (Letter from Hilary Sheard to Jay R. Brandon July 15, 2016) (detailing counsel's efforts from March 2015 through mid-2016). But from April 2016 until May 2017, counsel could not move forward to uncover facts in support of this motion—such as by investigating the mitigation evidence neglected by previous counsel, or traveling to collect records and interview witnesses—without the necessary funds. While there may have been reason to *suspect* Estelle and Jefferson's conduct could be grounds for relief in 2015, counsel could not represent to the Court that evidentiary support for such grounds existed or was likely to exist—as required under Rule 11—until after counsel was able to resume their inquiry in May 2017.

Preyor and his new counsel worked diligently to investigate the factual basis for each of the above-stated grounds for relief. The longest period of inactivity between 2015 and the filing of this motion occurred because of a year-long delay in approving new counsel's budget request. This motion is being filed as soon as could reasonably be expected, and good cause exists for each period of delay.

**III.     Preyor's Claim of Ineffective Assistance of Trial Counsel Is Substantial.**

The equities in this case require that this Court restore Preyor to the position he was in before Jefferson and Estelle fraudulently initiated federal habeas proceedings on his behalf.  *See supra* Sections I-II.   Once Preyor is restored to that position, he will finally have a fair opportunity to raise a compelling claim of ineffective assistance of counsel under *Wiggins v. Smith*, 539 U.S. 510 (2003)—a claim that none of his former attorneys bothered to investigate.

As noted above, Preyor's trial counsel Gross failed to hire a mitigation specialist, failed to investigate known red flags regarding Preyor's childhood, failed to interview family members regarding Preyor's childhood and social history, and failed to follow up on not one, but *two*, medical professionals' recommendations that Preyor be screened for mental illness or other executive-function issues affecting his capacity and judgment.   The cumulative effect of these omissions was disastrous.   Instead of presenting the real circumstances of Preyor's upbringing— one marked by severe physical and sexual abuse—trial counsel left the jury to believe that Preyor came from a fully functional home, with a uniformly close and supportive family.   Faced with no real explanation for the man Preyor had become, particularly in light of his seemingly rosy childhood, the jury inflicted the death sentence.   Given the deficiencies of trial counsel's mitigation investigation, there is a high likelihood that Preyor's underlying claim would succeed if given the opportunity to present it.   *See Seven Elves*, 635 F.2d at 402 (identifying "the merit in the movant's claim or defense" as a factor informing whether Rule 60 relief is appropriate).

## A. Preyor's Trial Counsel Failed to Provide the Robust Mitigation Investigation Required by *Wiggins*.

Preyor's trial counsel had an "obligation to conduct a thorough investigation of [Preyor's] background," *Williams v. Taylor*, 529 U.S. 362, 396 (2000), including "efforts to discover *all reasonably available* mitigating evidence.'" *Wiggins*, 539 U.S. at 524 (emphasis in original).

As *Wiggins* makes clear, counsel in death penalty cases must "investigate further" where existing evidence would prompt further investigation; counsel cannot simply abandon "investigation of [the defendant's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 527. By failing to investigate Preyor's social and familial history, Preyor's trial counsel's performance fell far below the minimum standards guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 687 (1984). And although current appointed counsel's mitigation investigation remains ongoing, it is already abundantly clear that those deficiencies severely prejudiced Preyor: There is more than a "reasonable probability that [the jury] would have returned with a different sentence" if confronted with the mitigating evidence that current appointed counsel has uncovered. *Wiggins*, 539 U.S. at 536.

### 1. Trial Counsel's Performance Was Deficient Under *Strickland*.

Trial counsel's failures are multiple and have been well recognized as grounds for finding ineffective assistance of counsel. Specifically, trial counsel (1) failed to investigate credible and significant "red flags" known to counsel, *Rompilla v. Beard*, 545 U.S. 374, 392 (2005); (2) neglected to hire a mitigation investigator, *see, e.g.*, *Canales v. Stephens*, 765 F.3d 551, 569 (5th Cir. 2014) (citing counsel's failure to hire a mitigation specialist as a key contributing factor to counsel's failure to discover significant, readily available mitigation evidence); *Escamilla v. Stephens*, 749 F.3d 380, 392 (5th Cir. 2014) (granting a certificate of appelability for an ineffective assistance of counsel claim based in part on counsel declining to hire a mitigation specialist); (3) failed to interview critical family members, *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (granting habeas relief when counsel failed to interview members of the defendant's family); and (4) failed to obtain readily available and relevant records, *id*. at 41 (penalty phase counsel was ineffective in part because he "did not obtain any of [the defendant's] school,

medical, or military service records"); *see also Trevino v. Davis*, 829 F.3d 328, 350 (5th Cir. 2016) (counsel was ineffective by "fail[ing] to elicit easily obtainable information").

Soon after being appointed to represent Preyor and handle the sentencing phase of the case, Gross obtained several key pieces of evidence regarding Preyor's upbringing. His co-counsel, Economidy, provided him with case files and a memorandum that identified several red flags indicating that Preyor may have history of mental illness and suicidal ideations, and suffered physical abuse by family members. *See* Ex. 1 at PREYOR000014-17 (Bexar Cty. Jail Med. Records). Further, Economidy's files reported that when asked whether Preyor had a juvenile record, Preyor's mother cryptically responded that "all incidents were kept in the family"—suggesting that there was something to hide. *Id.* at PREYOR000022-23 (Economidy Telecon. with Mendez, June 7, 2004). Gross was also aware that Preyor's mother "rescinded her consent for TaiChin to be seen" by a New York Bureau of Child Guidance counselor because she "felt too many personal matters were being discussed." Ex. 22, at 22 (Def.'s Sentencing Ex. 10, School Records). And when asked about this excerpt, Preyor's mother told Economidy "at least three times that 'it was too much an invasion of privacy.'" Ex. 1 at PREYOR000021 (Economidy File Notes, Aug. 9, 2004). It is possible Preyor's mother was referring to Preyor's contemporaneous sexual abuse, which she also relayed to Economidy, reporting that "one stepbrother had abused [Preyor] as a child." *Id.* Preyor's mother further reported that Preyor "has passed out from alcohol," and "fell down the stairs in a subway and wound up in the hospital." *Id.* at PREYOR000020 (Economidy Interview with Mendez and Jonathan); *id.* at PREYOR000018 (Letter from Economidy to Murphey and Gross Aug. 24, 2004) (stating that Preyor reported "an alcohol problem").

Dr. Joann Murphey, a psychologist engaged by trial counsel to evaluate Preyor, *see* Ex. 1 at PREYOR000040 (Letter regarding Aug. 16, 2004 Order Muprhey Appointment), similarly reported to Gross that Preyor's father "was 'short tempered' about his academic difficulties" and "beat him a lot," and that Preyor had used cocaine and marijuana since his twenties.  *Id.* at PREYOR000006-13 (Murphey Evaluation).  Dr. Eubanks, a neuropsychologist engaged by the defense, submitted a four-page report indicating that Preyor reported that "he broke his leg in a fall as a teenager," and "was pushed down an escalator and experienced a brief loss of consciousness" in his mid-twenties.  *Id.* at PREYOR000041-45 (Eubanks Evaluation).  Preyor himself also reported that his best friend was stabbed when he was young, and that he was threatened by gang members while growing up in Brooklyn.  *Id.* at PREYOR000035-37 (Gross File Notes, Oct. 11, 2004).

Armed with such significant indications that Preyor's childhood was anything but normal, it is inconceivable that a single defense attorney, with multiple obligations to Preyor and presumably other clients, could adequately pursue the extensive, multi-state investigation required to ascertain Preyor's life history.  Indeed, one of the mitigation specialists engaged by Preyor's current counsel has confirmed that a mitigation investigation of this scale requires significant time and resources to gain the requisite trust and develop rapport.  Ex. 23 (Decl. of Elizabeth Vartkessian, PhD ¶¶ 16-20) (hereinafter "Vartkessian Decl.").  For this reason, it has long been recognized that mitigation specialists are an "indispensable member of the defense team" and critical to conducting an effective mitigation investigation.  American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 959 (2003).

Gross, however, somehow felt he could handle Preyor's mitigation investigation—to the extent it can be so called—all on his own.  His refusal to engage a mitigation specialist or an expert otherwise qualified to conduct a sentencing investigation was not only deficient on its face, but also ensured that Gross' investigation was so cursory as to thwart any chance of uncovering the compelling mitigation evidence that Preyor's current counsel has since discovered.  *See, e.g.*, *Canales v. Stephens*, 765 F.3d 551, 569 (5th Cir. 2014) (citing counsel's failure to hire a mitigation specialist as a key contributing factor to counsel's failure to discover significant, readily available mitigation evidence); *infra* Section III(A) (discussing extensive mitigation evidence undiscovered by trial counsel).

After making the untenable decision to shoulder all of the responsibilities for Preyor's mitigation investigation, Gross did what was expected:  little to nothing.  In the seven months Gross had to prepare for trial, he met with Preyor for less than four hours—in total—and spoke to him by phone only once—one month prior to trial—for less than 12 minutes.  Ex. 1 at PREYOR000027-33 (Gross Billing Records).  Other than reviewing the minimal school and jail medical records Economidy had previously obtained, Gross' preparations amounted to obtaining a few of Preyor's most recent employment records and making a single trip to New York City in November 2004.  *Id.*; *see also* Mot. to Reimburse for Mitigation Trip, *State v. Preyor*, No. 2004-CR-3602 (290th Tex. Dist. Ct. Bexar Cty. Mar. 21 2005) (seeking compensation "for expenses incurred in traveling to New York, New York to investigate mitigation in this case").  And even over the course of three days, Gross spent more time trying to interview Preyor's teachers than he did speaking with members of Preyor's own family.  Ex. 1 at PREYOR000027-33 (Gross Billing Records).

And that was it.  The sum total of Gross' mitigation investigation was an introductory meeting with Preyor, a cursory records review, and superficial contact with Preyor's family during a brief trip to New York City.

Although trial counsel was not obligated "to investigate every conceivable mitigating lead," *Lampkin v. State*, 470 S.W.3d 876, 915 (Tex. App., Texarkana 2015), it is also well established that he cannot ignore such "red flags" that require further research, investigation, or testing.  *See Rompilla*, 545 U.S. at 392; *see also Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental health problems.").  Nor can trial counsel's failure to present this evidence at trial be attributed to any strategic decision, as Gross was unable to make a "fully informed decision with respect to sentencing strategy" without this critical information about Preyor's childhood.  *See Smith v. Dretke*, 422 F.3d 269, 284 (5th Cir. 2005).  Indeed, *Wiggins* itself makes clear that trial counsel's performance in this regard was deficient.  As in this case, the defense counsel in *Wiggins* became aware of the petitioner's difficult and abusive childhood from records but failed to further investigate, despite the fact that "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses."  539 U.S. at 525.

One obvious source of this information was Preyor's family members, who had a front row seat to Preyor's tumultuous childhood and its resulting effect on his development.  Trial counsel's failure to properly interview Preyor's family members—particularly those who allegedly participated or were aware of known physical and sexual abuse—was both astonishing and completely inadequate under *Wiggins*.  *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (granting habeas relief when counsel failed to interview members of the defendant's

family); *Trevino*, 829 F.3d at 350 (failure to interview defendant's abusive and alcoholic mother was deficient); *Escamilla*, 749 F.3d at 392 (granting COA where "counsel spent only a limited amount of time interviewing a select handful of [the defendant's] family members and acquaintances, and unreasonably relied upon their description of [the defendant's] childhood as stable."); *Ex parte Gonzales*, 204 S.W.3d 391, 394 (Tex. Crim. App. 2006) (counsel rendered ineffective assistance of counsel by failing to interview defendant's family about his sexual abuse).

Trial counsel had ample opportunity to interview Preyor's family, yet failed to meaningfully interview any of them. For nearly a decade preceding the crime, Preyor lived in San Antonio: the very city where the crime occurred, where trial counsel lived and worked, and where counsel otherwise investigated the crime. Yet, it appears trial counsel did not pursue any mitigation investigation in the San Antonio area, much less conduct mitigation investigations with key family members residing nearby.

Another obvious source of mitigation evidence was Sean Preyor-Johnson, Preyor's older brother, who lived in the area and worked at the San Antonio Police Department. Sean Preyor-Johnson has since provided first-hand accounts of the physical abuse that Preyor suffered as a child. In that mitigation interview, which occurred just this week, Sean Preyor-Johnson actually broke down when he learned that he could have helped his younger brother by providing important details of his childhood. *See* Ex. 24 (Decl. of Salima Pirmohamed ¶¶ 4-8) (hereinafter "Pirmohamed Decl."). And he confirmed that, if he had known such evidence could have precipitated a life sentence, he would have shared it earlier. *Id.* ¶ 6. Yet trial counsel simply never asked. Economidy and Gross were in touch with Sean Preyor-Johnson regarding their investigation of the crime and Preyor's innocence—but nothing more. *Id.* ¶ 5-8.

Nor did Gross dedicate sufficient time to interviewing Preyor's large family during his cursory visit to Brooklyn, New York, in November 2004.  Gross spent nearly two-thirds of his trip ticking through the list of teachers referenced on Preyor's school records.  By contrast, he only spent a single day talking to Preyor's family, for a handful of hours.  Mitigation specialists' recent efforts to interview family members based in New York has confirmed that that time was not nearly enough to even *locate* Preyor's family members, much less conduct any meaningful interviews.  After a two and a half hour interview with three of Preyor's close family members—including his father, half-sister, and half-brother—current counsel's mitigation specialist opined "[i]t was evident that secrecy is firmly ingrained into Mr. Preyor's family culture," requiring "many visits to get details of Mr. Preyor's childhood."  Vartkessian Decl. ¶ 16.  Clinical psychologists, mitigation experts, and mental health experts agree: rapport is an "essential component of effective interviewing."  *Id.* ¶¶ 17-19.  Even an experienced mitigation specialist would require significant "time and resources" to "gain trust and learn more about Mr. Preyor's abuse and life history."  *Id.* ¶ 20.

Given these prerequisites for conducting effective interviews of critical family members, it is even more difficult to imagine how Gross could have adequately interviewed even the most critical family members in the area—including Preyor's father, mother, and at least three of his siblings—in such a short period of time.  Indeed, Preyor's mother reported that their meeting in Brooklyn lasted no more than an hour, and that their conversation amounted to no more than a discussion of what to expect at trial.  Mendez Aff. ¶ 4.

The paucity of Gross' efforts is particularly troubling because he had reason to know of possible sexual abuse and still neglected to inquire about the issue.  *See, e.g.*, *Johnson v. Sec'y, DOC*, 643 F.3d 907, 933 (11th Cir. 2011) ("No reasonable attorney, after being told by his client

that he had an abusive upbringing, would fail to interview members of his client's family who were readily available and could corroborate or refute the allegations of abuse."). It is no excuse that the few family members contacted by trial counsel did not volunteer this information to trial counsel, *see Ex parte Gonzales*, 204 S.W.3d at 394 (finding counsel ineffective when he failed to ask family members about known physical and sexual abuse), particularly when it appears that no family members were aware of the potential value of such evidence. *See, e.g.*, Pirmohamed Decl. ¶ 5-8, 23.

After refusing to hire a mitigation specialist, declining to pursue known "red flags," and rejecting opportunities to interview key family members, one would hope that trial counsel could have at least acquired and reviewed Preyor's readily available medical records. But again here, trial counsel failed Preyor. Apart from scattered school, jail, and employment records, there is no indication that trial counsel sought any medical records beyond those collected from the Bexar County jail where Preyor was held before trial. Trial counsel failed to collect these records despite visiting the city where Preyor grew up, and despite residing in the city where Preyor lived as an adult. For example, Preyor's father reported to Gross that Preyor broke his leg in 1987, Ex. 1 at PREYOR000025 (Gross File Notes, Nov. 14, 2004), and that Preyor was treated at Bellevue Hospital Center after he fell down the stairs at a New York subway station as a result of a blackout. *Id.* at PREYOR000026 (Gross File Notes). Despite being *specifically informed* of these significant medical incidents, Gross made no effort to obtain them while he was in New York or thereafter.

Trial counsel's failure to obtain these records—an issue in and of itself—was particularly problematic given that counsel was aware of Preyor's problems with his mental health, that he was physically and sexually abused, and that he abused alcohol and drugs—problems relevant to

the mitigation case that would have been fleshed out by medical records, child protective service records, and counseling records. This failure to obtain medical records—much as with trial counsel's other failures—cannot be attributed to a strategic choice. *See Roberts v. Dretke*, 356 F.3d 632, 639 (5th Cir. 2004) ("Where . . . counsel is aware of the client's history of mental problems, the reasonableness of a decision made by counsel not to investigate that history [or obtain medical records] is suspect."). It, too, constituted ineffective assistance of counsel. *See Porter*, 558 U.S. at 39 (penalty phase counsel was ineffective in part because he "did not obtain any of [defendant's] school, medical, or military service records"); *see also Trevino*, 829 F.3d at 350 (counsel was ineffective for "fail[ing] to elicit easily obtainable information"); *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 553 (11th Cir. 2015), *cert. denied sub nom. Hardwick v. Jones*, 137 S. Ct. 41 (2016), and *cert. denied sub nom. Jones v. Hardwick*, 137 S. Ct. 61 (2016) (counsel was deficient by failing to obtain the defendant's "readily available life-history records, such as his school, medical, psychiatric, foster care, juvenile justice, or social-services records, even though the notes provided by the Assistant Public Defender clearly pointed him toward such information"); *Roberts*, 356 F.3d at 639 (granting COA where counsel failed to obtain medical records despite knowing of defendant's psychiatric hospitalization and suicide attempt).

In sum, counsel's deficiencies were multiple: failing to hire a mitigation specialist or similarly qualified investigator; ignoring viable leads regarding significant mitigation evidence; conducting barebones interviews of select family members while ignoring others who were both critical to the investigation and readily available; and failing to obtain readily available medical records critical to an adequate mitigation investigation. And it is also clear, as discussed further below, that Preyor was prejudiced by trial counsel's significant failings. Current counsel's

recent, ongoing investigation has confirmed that trial counsel's deficient performance deprived the jury of critical mitigation evidence regarding Preyor's upbringing.

2.   <u>Preyor Was Prejudiced by Trial Counsel's Performance.</u>

Preyor was severely prejudiced as a result of trial counsel's myriad deficiencies.  Given the remarkable amount of mitigation evidence that trial counsel failed to investigate or present, there is more than a "reasonable probability" that Preyor would not have been sentenced to death had this evidence been presented to the jury.  *Wiggins*, 539 U.S. at 536.  To determine whether a defendant is prejudiced by a failure to investigate mitigation evidence, a court must "reweigh the evidence in aggravation against the totality of available mitigating evidence."  *Id.* at 534.  Here, trial counsel's errors prevented the jury from hearing about Preyor's traumatic childhood and history of substance abuse; all of which would have changed the jury's sentence had they been presented.

a.   <u>The Jury Was Deprived of Critical Information Regarding Preyor's Traumatic Childhood.</u>

Preyor was first prejudiced by his counsel's failure to inform the jury of compelling mitigating evidence regarding Preyor's harrowing upbringing.  The abuse and poverty Preyor suffered were so severe "that a jury confronted with such mitigating evidence would have returned with a different sentence."  *Wiggins*, 539 U.S. at 513.

"[E]vidence about the defendant's background and character is relevant [to mitigation] because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."  *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).  Moreover, evidence of child abuse is a particularly significant mitigating factor that would cause a juror to choose a sentence less severe than death

42

as a history of child abuse "may have particular salience for a jury" who may see a defendant as less culpable and deserving of less severe punishment.  *Porter*, 558 U.S. at 43.  Indeed, the Texas Court of Criminal Appeals long ago held that evidence of childhood violence, abuse, and poverty are mitigating factors a jury may consider.  *See Ex parte Goodman*, 816 S.W.2d 383, 384 (Tex. Crim. App. 1991); *Lewis v. State*, 815 S.W.2d 560, 567 (Tex. Crim. App. 1991).

Recognizing the powerful impact this evidence has, the U.S. Supreme Court made clear in *Wiggins* and *Williams* that prejudice exists where a jury does not know of a defendant's abuse as a child as a result of counsel's deficient performance.  In *Wiggins*, the Supreme Court held that there was prejudice because counsel did not present to the jury evidence of the defendant's "troubled history," including "physical torment, sexual molestation, and repeated rape." *Wiggins*, 535 U.S. at 534-535.  Similarly, in *Williams* the Supreme Court explained that a defendant was prejudiced by his counsel's failure to investigate the abuse and neglect he sustained as a child because information about the defendant's "childhood, filled with abuse and privation . . . might well have influenced the jury's appraisal of his moral culpability."  529 U.S. at 398.  And the Texas Court of Criminal Appeals in *Gonzales* also recognized the prejudicial effect of counsel's failure to present evidence of child abuse, granting relief on such a claim while concluding that evidence of repeated physical and sexual abuse "'might well have influenced the jury's appraisal" of the applicant's moral culpability."  *Ex parte Gonzales*, 204 S.W.3d at 399.

The facts and degree of prejudice are similar in the instant case.  Despite having a basis to believe that an investigation would uncover significant mitigating evidence, Preyor's counsel failed to conduct a meaningful investigation into Preyor's life history and failed to present evidence at sentencing about the pervasive physical and sexual abuse Preyor suffered as a child.

As a result, the jury that sentenced Preyor to death had a woefully inadequate understanding of Preyor's life leading up to the crime.  Had the jury known this information, there is a substantial probability that it would have sentenced Preyor to a sentence other than death.

Counsel's recent investigation has confirmed that Preyor suffered extensive childhood abuse from multiple family members who should have been responsible for his care and safety. A review of this powerful and troubling evidence makes clear how likely it was that Preyor would not have received a death sentence had this evidence been presented.  Preyor recalls in his earliest memories that his father beat him and whipped him with a belt.  *See* Pirmohamed Decl. ¶¶ 9-10.  At times Preyor could not attend school or leave the house because his wounds were too visible.  *Id.* ¶¶ 11-12.

Preyor's mother also severely abused him.  At the age of 14, Preyor was hospitalized with two broken ankles and a broken hand, which he sustained after jumping from the fourth floor of his apartment building in an attempt to escape from his mother, who was chasing him with a knife.  *See* Ex. 25 (N.Y. Admin. for Children's Servs. Summary Sheet, 1984-1985); Pirmohamed Decl. ¶ 15.  Preyor also met with violence from other adults in his life.  In one incident, after Preyor intervened after witnessing his mother's boyfriend choking his brother Sean, the boyfriend found a knife and backed Preyor into a wall.  *Id.* ¶ 26.  On another occasion, he remembers waking up in the middle of the night and witnessing his mother naked, being beaten by her boyfriend.  *Id.* ¶ 24-25.  When Preyor attempted to defend his mother, he ended up in a physical altercation with her boyfriend.  *Id.*  The police were called, and when they told Preyor's mother that either her boyfriend or Preyor would need to be removed from the home, she made Preyor leave.  *Id.*  This was not the only time his mother chose a lover over her own son.  *Id.* ¶ 31.

In addition to the physical violence Preyor suffered, he also suffered sexual abuse at the hands of a close family member. *Id.* ¶ 18. This family member began sexually abusing Preyor when Preyor was in elementary school. *Id.* ¶ 19. The abuse grew more frequent and escalated from touching to sodomizing and digital penetration. *Id.* ¶ 20. This abuse still haunts Preyor; he feels he has "been holding on to all of this all [his] life." *Id.* ¶ 21.

Other adults who should have protected Preyor also failed him. A caseworker responsible for investigating allegations that Preyor's mother sexually abused him never spoke to Preyor. The caseworker instead took Preyor's mother at her word when she stated that she was not abusing him and conducted no follow-up investigation. *Id.* ¶ 7. Preyor also briefly met with a school counselor. But when Preyor's mother pulled him from counseling, believing that he would reveal too much about his family life, the school never inquired further about Preyor or took steps to ensure Preyor's safety. *Id.* ¶ 29. In short, current counsel's investigation highlights that substantial and troubling evidence could have been presented of Preyor's history of abuse as a child; evidence that would have undoubtedly led the jury to sentence Preyor to a sentence less than death at the punishment phase.

In addition to the physical and sexual abuse, Preyor had no escape outside of the home. Preyor's parents isolated him from other children—friends were not allowed to visit, and after his brother Sean moved out, Preyor was not permitted to stay in contact with him. Preyor was not even allowed to attend his own brother's wedding. *See* Pirmohamed Decl. ¶ 28-29. Preyor lived in a home with no affection, *id.* ¶ 30, and constantly felt that his father's legitimate family did not want him hanging around. *Id.* Even when Preyor could leave his home, he was plagued with violence and fear. He and his siblings resisted joining a neighborhood gang, but they paid

for it:  on one occasion Preyor's brother was stabbed, and on another his close friend was killed. *Id.* ¶ 32.  Preyor was also targeted because of his race.  *Id.* ¶ 33.

b.  <u>Preyor's Decades of Substance Abuse Inhibited His Decision-Making.</u>

Counsel's failure to present evidence of Preyor's substance abuse also prejudiced him at sentencing as it is substantially likely that the jury would not have sentenced Preyor to death had it known about his substance abuse and its root causes.  As with child abuse, substance abuse is highly relevant mitigation evidence.  And courts have held that failure to uncover this evidence and present it to a jury results in prejudice to the defendant under *Strickland*.  For example, in *Rompilla*, counsel "failed to investigate 'pretty obvious signs' that" the defendant suffered from alcoholism and adduce that evidence at trial.  545 U.S. at 379, 382.  As a result, the jury could not consider how the defendant's alcoholism might have made him less culpable for committing the crime, and thus worthy of a lesser sentence.  The Court held that counsel's failure to inform the jury of the defendant's alcoholism, along with other mitigating factors, prejudiced the defendant.  *Id.* at 390-393.  *See also Escamilla*, 749 F.3d at 385 (granting COA where counsel did not inform the jury that defendant "regularly and severely abused alcohol since age nine, he smoked marijuana as a child, and was unable to access recommended substance abuse treatment"); *Morales v. Mitchell*, 507 F.3d 916, 935 (6th Cir. 2007) (prejudice existed where counsel failed to investigate and present to a jury information about defendant's "continued and uncontrolled alcohol and drug abuse").

As in *Rompilla*, trial counsel's failure to present evidence at sentencing of Preyor's longtime struggle with substance use and addiction amounted to prejudice under *Strickland*. Preyor experimented with drugs and alcohol as a teenager as a mechanism for dealing with the childhood abuse he had suffered starting from his early adult life.  See Ex. 26 at 7 (Expert Report

of Dr. George W. Woods) (hereinafter "Woods Expert Report") ("Mr. Preyor abused substances to mitigate the effects of the trauma he suffered"). In fact, "[t]he combination of sexual trauma, physical trauma, and the trauma navigating his community instilled in him a wariness, a scanning mentality that led to self-medication with alcohol, then cocaine to smooth off the edges." *Id*. The "multiplicity of traumatic stressors enhanced [Preyor's] vulnerability to chemical dependency as a method of cutting himself off from the world." *Id*. And although he periodically stopped using cocaine, he continued to drink heavily and had been drinking the night of the crime. Pirmohamed Decl. ¶¶ 39-40. This evidence undoubtedly would have been relevant to Preyor's culpability for his actions, but none of it was presented at sentencing. The jury never learned why Preyor began using drugs or the pervasiveness of his struggle with addiction.

Perhaps most critically, the jury never learned how Preyor's addiction at the time of the crime may have affected his actions and seen him as less culpable of his crimes or in control of his impulses. *See, e.g.*, *Monakino v. State*, No. 01-14-00361-CR, 2016 WL 6087683, at *7 (Tex. App., Houston Oct. 18, 2016) (remanding for resentencing where trial counsel, among other things, failed to investigate or develop information in a report "that appellant had extensive substance abuse problems"). For instance, chronic alcohol and cocaine abuse can result in severe psychological and emotional effects, including mood swings, anxiety, violent behavior, rage, paranoia, delusions of extraordinary abilities, distortions of perspective, and impaired mental functioning, including impaired judgment. Cocaine, for example, can cause a user to have a significantly impaired ability to inhibit behavioral responses. Mark T. Fillmore & Craig R. Rush, *Impaired Inhibitory Control of Behavior in Chronic Cocaine Users*, 66 Drug & Alcohol Dependence 265 (2002). Cocaine use can also cause substantial neuropsychological impairment,

including attention and memory deficits and impaired social cognition, including emotional recognition and decision-making.  Matthias Vonmoos et al., *Cognitive Impairment in Cocaine Users Is Drug-Induced but Partially Reversible: Evidence from a Longitudinal Study*, 39 Neuropsychopharmacology 2200 (2014).  Heavy drinking likewise impairs executive cognitive functioning measures, especially those pertaining to response inhibition.  Rebecca J. Houston et al., *Effects of Heavy Drinking on Executive Cognitive Functioning in a Community Sample*, 39 Addict Behav. 345 (Jan. 2014); *see also* Woods Expert Report at 7-8 (explaining the effect of Preyor's substance abuse on his cognitive functioning).

Preyor's chronic drug and alcohol abuse likely played a significant role in his actions and thought processes before, during, and after the crime.  But his trial counsel failed to present this crucial mitigating evidence to the jury.  Trial counsel's failure to do so likely altered the outcome of Preyor's sentencing.

c.  <u>This Mitigating Evidence Would Have Outweighed the Minimal Aggravating Evidence Presented by the State.</u>

Without the benefit of this remarkable mitigation evidence, the jury was left with not only a false impression of Preyor's childhood and background, but also without any explanation for how Preyor could have emerged from a supposedly wonderful family to become a convicted murderer.  In some other jurisdictions, with different sentencing statutes, a "weighing" approach is utilized, re-weighing all of the evidence in aggravation which the jury would have had, including evidence which would have come in along with the mitigation evidence, against the totality of available mitigating evidence had trial counsel chosen a different course.  *See, e.g., Wong v. Belmontes*, 558 U.S. 15, 20 (2009). In Texas, however, the jury "answer[s] a mitigation issue," rather than conducting a "direct balancing of aggravating and mitigating circumstances." *Ex parte Gonzales*, 204 S.W.3d at 393-394; *Ex parte Davis*, 866 S.W.2d 234, 239 (Tex. Crim.

App. 1993) (en banc) ("Unlike Florida, where *Strickland* arose, we do not have a capital sentencing scheme that involves the direct balancing of aggravating and mitigating circumstances."). Thus, the Texas Court of Criminal Appeals requires a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently. *Ex parte Gonzales*, 204 S.W.3d at 393-94 (adopting U.S. Supreme Court's test for assessing prejudice under *Strickland*); *see also Ex parte Kerr*, 2009 WL 874005, at *2 (Tex. Crim. App. Apr. 1, 2009) (applying the *Gonzalez* standard in an ineffective assistance case where trial counsel were unaware of mitigation evidence including "possible fetal alcohol syndrome.") In light of the State's narrow presentation of aggravating evidence, there is more than reasonable probability that the jury would have voted for a life sentence if they were aware of Preyor's tumultuous and tragic childhood.

The State's aggravating evidence was limited, to say the least: three of its six witnesses at the punishment phase testified regarding Preyor's 1999 conviction for possession of cocaine. Ex. 27 at 15-64 (Trial Tr., Mar. 11, 2005). This conviction—for which Preyor served a single year in prison, after declining the prosecutor's offer of an alternative sentence with probation— came after Preyor fled officers attempting to arrest him for possessing cocaine. *Id.* at 34-38. Other than attempting to flee the scene, the incident was non-violent. *Id.* Preyor was not carrying a weapon when he was arrested, and did not harm either of the officers while attempting to escape arrest. *Id.* A San Antonio police officer testified regarding a family violence call at Preyor's house, an incident which was resolved without any evidence of physical violence ever occurring. *Id.* at 48-52. Finally, a criminal investigator introduced pictures of Preyor's tattoos bearing the dates of the crimes for which he was convicted. *Id.* at 53-56. Defense witness Dr.

Joann Murphey later testified that these tattoos reflected Preyor's desire to be reminded of "things that he did that he never ever wanted to repeat again." *Id.* at 129.

Trial counsel did little to counter this aggravating evidence, as minimal as it was, leaving the jury without valuable context for how Preyor became the man sitting before them at trial. Eight witnesses testified for the defense during the sentencing phase of Preyor's trial, including a guard at the Bexar County jail, an inmate classification manager at the Bexar County Sheriff's Office, a childhood friend, three of Preyor's brothers, Preyor's mother, and Dr. Joann Murphey. Collectively, their testimony focused on portraying Preyor as a passive individual who did not present a threat of future dangerousness, and who came from a loving and supportive family. Bexar County jail guard Michael Alvarado and Bexar County inmate classification manager Patrick Skillman testified regarding Preyor's good behavior while incarcerated, including his calm demeanor during stressful situations. *Id.* at 69-74, 94-98. Childhood friend Cory Hannah testified that Preyor was not violent while growing up in Brooklyn, New York. *Id.* at 90-91. Preyor's younger brothers, Benjamin Preyor and Jonathan Preyor, appeared in their respective U.S. Army and New York Fire Department uniforms, testifying that Preyor was a loving brother who never picked a fight as a child. *Id.* at 78-87. Sean Preyor-Johnson, Preyor's older brother and a member of the San Antonio Police Department, testified that Preyor did not fight as a child. *Id.* at 99, 103. Preyor's mother introduced pictures of Preyor with his family, and reported that Preyor had poor grades in school, but never had any disciplinary problems and rarely got in to fights. *See id.* at 132-142. Finally, clinical psychologist Dr. Joann Murphey described Preyor as an introvert who was docile and passive, but otherwise devoted most of her testimony to discussing Preyor's school records. *Id.* at 113-117.

In closing statements, Gross then summarized the mitigating circumstances as "the problems he had in school, the poor grades he had in school," possible "psychological problems or maybe a learning disorder" during school, and the fact that he had to "provide for himself" after his dad "pull[e]d him out of school." Ex. 3 at 15, 17 (Trial Tr., Mar. 14, 2005). Pointing to testimony by Preyor's family, Gross argued that he had a "good family" with "caliber people" who are "squared-away" and demonstrated that Preyor was "not a violent person." *Id.* at 16. In response, the State, unsurprisingly, dismissed the defense witnesses' testimony as irrelevant because "they don't know Box"—Preyor's nickname as an adult—citing the lack of any testimony regarding how Preyor's childhood experiences influenced the man he became by the time of the crime. *Id.* at 10-11, 26.

There can be little doubt that, given the superficial and inaccurate profile provided at trial, there is more than a "reasonable probability" that Preyor would have received a life sentence if this significant mitigation evidence had been presented at trial. Contrary to the story told at trial, Preyor suffered a tumultuous childhood wrought by physical and sexual abuse which later caused him to turn to alcohol and cocaine to cope. Lacking this critical information regarding Preyor's life history, the jury wrongly concluded that only a sentence of death was appropriate. But if armed with this critical understanding of Preyor's upbringing, there is more than a reasonable possibility that the jury would have reached a different result.

* * *

The deficiency of trial counsel's mitigation investigation—and the prejudice it inflicted on Preyor—should have been obvious to any competent lawyer. Yet no state or federal court has considered the merits of Preyor's *Wiggins* claim due to the ineffectiveness of Preyor's state habeas counsel, compounded by the procedural defects in his federal habeas proceedings.

51

### B.  State Habeas Counsel Was Ineffective for Failing to Raise Preyor's Meritorious *Wiggins* Claim.

Following in trial counsel's footsteps, Preyor's state habeas counsel failed to conduct an adequate mitigation investigation.  Although court-appointed habeas counsel Terry McDonald secured $5,000 in court funding to hire mitigation specialist Ann Matthews, *see* Ex. 1 at PREYOR000054-56 (Order, *State v. Preyor*, No. 2004–CR–3602 (290th Tex. Dist. Ct. Bexar Cty. Apr. 17, 2006)), the only available memorandum[5] summarizing Matthews' conclusions identifies only two things that "should have been done differently": (1) pursuing what she described as "the latest thing," arguing that "[lethal injection drugs] are unconstitutional"; and (2) engaging a prison classification officer to "explain life in prison vs. death row."  Ex. 1 at PREYOR000057 (Matthew Memo. to McDonald).  Matthews' conclusions, like her invoices, are devoid of any meaningful mitigation investigation.  Matthews reported that she spent a total of five hours talking with family members by phone—though counsel has not identified any family members who spoke with Matthews, *see* Johnson Aff. ¶ 8; Mendez Aff. ¶ 11; Vartkessian Decl. ¶¶ 9-10; Pirmohamed Decl. ¶¶ 8, 23—and met with Preyor on just a single occasion for three hours, hardly enough to discuss Preyor's extensive family history, much less acquire a meaningful understanding of his social history.  Ex. 1 at PREYOR000046-49 (Matthew Billing Records).  In addition, some four hours are invoiced for contacting an expert and preparing for an expert evaluation, but there is no indication as to who this expert was or what expert testimony Matthews proposed introducing on behalf of Preyor.  *Id.*

McDonald appears to have wholly relied on Matthews' work and otherwise been uninvolved with the mitigation investigation.  McDonald's billing records confirm that he never

---

[5]  Counsel contacted both McDonald and Matthews to attempt to procure documents related to the mitigation investigation, but neither has been able to identify any documents memorializing their efforts or findings, nor does McDonald or Matthews have any recollection of the investigation.

visited Preyor, *id.* at PREYOR0000058-67 (McDonald Billing Records), meeting him for the first time at the state habeas evidentiary hearing.  *See* Mendez Aff. ¶ 36 (recalling Preyor asking McDonald, "Who are you?"); Johnson Aff. ¶ 2.  In one of the few letters McDonald wrote to Preyor, he informed Preyor that there were "very few grounds for relief," identifying only the two claims previously identified by Ann Matthews:  (1) challenging lethal injection as cruel and unusual punishment; and (2) asserting ineffective assistance of counsel for failure to call a prison classification officer to testify at trial.  *Id.* at PREYOR0000053 (Letter from McDonald to Preyor, Dec. 23, 2006).  McDonald went on to ask Preyor to "please contact [him] as soon as possible" if he wanted any other issue raised.  *Id.*  Considering McDonald spent over a quarter of his time on the case obtaining and reviewing the transcript, *see id.* at PREYOR0000058-67 (McDonald Billing Records), it is no surprise that his remaining time did not produce any viable claims for relief.  And beyond spending a few hours allegedly "review[ing] possible mitigation material," there is no indication that McDonald ever sought or reviewed trial counsel's files— files littered with remarkable leads for any alleged mitigation investigation.  Nor is there any indication that McDonald ever spoke with Matthews about her investigation, or otherwise supervised her work.  An affidavit from McDonald in a subsequent case highlights that his representation of Preyor might have been in keeping with his regular practice.  McDonald attested that while he had worked "with Ms. Matthews for several years on many capital cases," he routinely "left all the mitigation investigation and development to her" and completely failed to speak with a client's family members in one case.  *See* McDonald Aff. ¶¶ 3,6, *Sells v. Dretke*, No. 5:08-cv-00465-OLG, (W.D. Tex., San Antonio Aug. 9, 2011), ECF. No. 136-1.

McDonald then filed an initial application for a writ of habeas corpus which—including McDonald's affidavit in support—numbered a total of 15 pages, and attached merely two

exhibits: (1) a declaration related to the constitutionality of lethal injection drugs; and (2) a brief statement from a prison classification expert.  Ex. 4 (Appl. for Writ of Habeas Corpus).  Neither exhibit discussed Preyor or his trial.  The writ raised eleven grounds for relief—many of them raising the same issues separately under federal and state law.  Those grounds included assertions that:  Preyor was denied effective assistance of counsel by trial counsel's failure to investigate the facts to develop a consistent trial strategy; Preyor was denied effective assistance of counsel due to trial counsel's failure to investigate and present evidence that a burglary did not occur; Preyor's counsel failed at the punishment phase to explain how the prison system worked as to the issue of Preyor's future dangerousness; the trial court failed to properly instruct the jury on mitigation; Texas's lethal injection protocol was unconstitutional; and Preyor's indictment for felony murder was improper and violated the merger doctrine.  *See generally id.*  None of the grounds included any assertion or claim that trial counsel failed to properly conduct a mitigation investigation.

It goes without saying that, with the exception of actually hiring a purported mitigation investigator, Preyor's state habeas counsel fared just as poorly as his trial counsel, causing Preyor to default his meritorious *Wiggins* claim.  *See Trevino v. Thaler*, 133 S. Ct. 1911, 1915, 1921 (2013) (remanding for further proceedings where state habeas counsel defaulted a *Wiggins* claim); *Trevino*, 829 F.3d at 348-349 (holding that state habeas counsel is required "to perform some minimum investigation prior to bringing the initial state habeas petition" where there is a "facially deficient investigation by the state trial counsel"); *see also Wiggins* at 349 (finding that a petitioner sufficiently pleaded his state habeas counsel was ineffective where habeas counsel failed to present a *Wiggins* claim and the deficiency in state trial counsel's mitigation "investigation would have been evident to any reasonably competent habeas attorney").  There is

no indication that McDonald or Matthews interviewed any family members, much less that they interviewed the critical family members who may have had knowledge of the physical and sexual abuse Preyor endured.  *See Porter*, 558 U.S. at 39 (counsel ineffective by failing to interview members of the defendant's family).  Nor is there any indication that state habeas counsel conducted even the slightest investigation into the myriad "red flags" available to trial counsel—some of which were referenced in the trial record.  *See Rompilla*, 545 U.S. at 392; *see, e.g.*, Ex. 22, at 22 (Def.'s Sentencing Ex. 10, School Records).  Nor did state habeas counsel seek the copious medical records which were easily obtainable.  *See also Trevino*, 829 F.3d at 350 (counsel was ineffective for "fail[ing] to elicit easily obtainable information").  As a result of these failings, Preyor was deprived of the opportunity to present a *Wiggins* claim which, as discussed above, had a strong likelihood of providing him with post-conviction relief.

## CONCLUSION

Preyor's attorneys failed him at every turn.  His trial counsel ignored glaring references to significant mitigation evidence, depriving the jurors of critical information likely to persuade them to impose a life sentence.  Preyor's state habeas counsel fared no better, presenting an anemic state habeas application, at best.  And then Jefferson and Estelle entered the scene, committing a remarkable fraud that effectively thwarted Preyor's only remaining opportunity for relief.  Given these rare and extraordinary circumstances, and to protect the integrity of the judicial system, this Court should exercise its equitable discretion to grant Preyor's request to set aside the judgment on his federal habeas petition, reopen his habeas proceedings, and allow him to pursue his claims for relief with the assistance of licensed and qualified counsel.

Preyor requests oral argument on this Motion.

Dated:  July 14, 2017                                    Respectfully submitted,


                                                            /s/ Catherine E. Stetson
                                                         CATHERINE E. STETSON*
                                                         ELIZABETH C. LOCKWOOD*
                                                         HOGAN LOVELLS US LLP
                                                         555 Thirteenth Street NW
                                                         Washington, DC 2004
                                                         (202) 637-5491
                                                         cate.stetson@hoganlovells.com

                                                         MARK E. OLIVE*
                                                         320 W. Jefferson Street
                                                         Tallahassee, FL 32301
                                                         (850) 224-0004
                                                         meolive@aol.com

                                                         HILARY SHEARD
                                                         Texas Bar # 50511187
                                                         7421 Burnet Road, # 300-512
                                                         Austin, TX 78757
                                                         (512) 524-1371
                                                         hilarysheard@hotmail.com

                                                         *Admitted pro hac vice

                                                         Counsel for Petitioner TaiChin Preyor

## CERTIFICATE OF CONFERENCE

I certify that on July 14th 2017 I conferred with Erich Dryden of the Office of the Texas Attorney General, to inquire about their opposition to this motion.  He responded that the Respondent is opposed to the stay of execution.

               /s/ Catherine E. Stetson

Catherine E. Stetson

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July 2017, I electronically filed the foregoing Motion for Relief from Judgment using the CM/ECF system, which will send a notice of electronic filing to all Counsel of Record.

               /s/ Catherine E. Stetson

Catherine E. Stetson